*This opinion is subject to revision before final publication in the Pacific Reporter*

**2018 UT 2**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

CHRISTOPHER JOHN ELLIS,
*Appellant.*

No. 20150486
Filed January 23, 2018

On Direct Appeal

Third District, Salt Lake
The Honorable Katie Bernards-Goodman
No. 131902294

Attorneys:

Karen A. Klucznik, Asst. Solic. Gen., Salt Lake City, for appellee

Alexandra S. McCallum, John K. West, Salt Lake City, for appellant

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and JUDGE BROWN joined.

JUSTICE HIMONAS filed a concurring opinion, in which CHIEF JUSTICE DURRANT and JUDGE BROWN joined.

Due to her retirement, JUSTICE DURHAM did not participate herein; DISTRICT COURT JUDGE JENNIFER BROWN sat.

JUSTICE PETERSEN became a member of the Court on November 17, 2017, after oral argument in this matter, and accordingly did not participate.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶ 1    Christopher Ellis was found guilty of aggravated robbery and possession of a firearm by a restricted person. We reverse the aggravated robbery conviction but affirm the possession conviction.

¶ 2    We reverse the aggravated robbery conviction because we find prejudicial error in the admission of preliminary hearing testimony under rule 804 of the Utah Rules of Evidence. First, we find that the district court erred in its determination that the witness in question was unavailable for trial. We hold that unavailability may not be established merely on the basis of an illness on the particular day a trial is scheduled by the court; there must be a showing that the illness is of such an extended duration that a reasonable continuance would not allow the witness to testify. And we find that the witness in question here was not unavailable under the standard that we clarify herein. Second, as in *State v. Goins*, 2017 UT 61, --- P.3d ---, we find that the preliminary hearing testimony at issue here was inadmissible because the defendant's motive to cross-examine witnesses at the preliminary hearing was not similar to the one he would have at trial. And we reverse the aggravated robbery conviction because we conclude that the preliminary hearing testimony in this case was central to the prosecution's case on this charge.

¶ 3    We affirm the conviction on the possession charge despite the fact that the State has not sought to defend the admissibility of the evidence challenged by Ellis on appeal—field test results, offered to confirm that a substance found on Ellis was marijuana. We affirm this conviction on the basis of our determination that any error in admitting this evidence was harmless.

I

¶ 4    Shortly before closing time on February 14, 2013, a man walked into Mini's Cupcakes in Salt Lake City, pointed a handgun at the store clerk, and demanded the contents of the cash register. The store clerk, Dylan Weight, promptly complied, giving the man nearly four hundred dollars, including a one-hundred dollar bill, and the store's receipts. The robber ordered Weight to get on his belly, and the man rushed out the door.

¶ 5    Weight got to his feet and ran outside to see where the robber was headed. He saw the man cross 1100 East but lost sight of him as the man turned right on the next intersecting street. Weight also dialed 911 on his cell phone.

¶ 6    Weight described the robber to the 911 operator as a Mexican or Native American man in his mid-40s. He recounted that the man wore a gray or green hoody and black pants and had "dark,

possibly longer hair." Weight also described the handgun as "like a Ruger" because of its shape and longer barrel, though he acknowledged his lack of gun expertise.

¶ 7     As Weight called 911, Brandy Thomas was driving on 1100 East and noticed a man dart across the street in heavy traffic. Her mother and two younger brothers were also in the car. Thomas noticed the store clerk on the side of the road talking on his phone and looking "really scared." She thought the incident significant enough to turn left and follow the man she had seen crossing traffic. She then saw him get into a four-door sedan that she believed was a gray or gold Nissan. She drove by the car slowly, and someone in her car wrote down the license plate number.

¶ 8     After she picked up her boyfriend, Thomas returned to Mini's Cupcakes and told Weight what she had seen. The store clerk relayed the license plate number to the 911 operator. The police received the license plate number and found that it corresponded to a gray Chevy Malibu registered to Christopher Ellis. The police in the area set out to find the car. Soon after the search began, an officer stopped at Ellis's house, but Ellis was not there and police could not locate the car.

¶ 9     Police later spotted the Malibu turning into a residential alleyway. The officer followed the car but lost sight of it after the driver shut off the lights and exited via another egress. Soon thereafter an officer discovered the Malibu pulling into a 7-Eleven convenience store and stopped the vehicle. Police found Ellis, who is African-American, wearing a black leather jacket, a red shirt, blue jeans, and a straw fedora. He also had short hair.

¶ 10   Ellis consented to a search, and police found $359.50 in his front pocket, including a one-hundred dollar bill. Ellis insisted that he received the cash from working temporary jobs and that he did not use a bank. After the vehicle was seized and pursuant to a warrant, officers also discovered two handguns inside the car's trunk. Police never recovered a hoody or any Mini's Cupcakes receipts.

¶ 11   The police also found a "clear baggy that contained a plant-like substance" in Ellis's pocket. Officer Wright later identified the substance as marijuana from its look, smell, and texture. He recognized it as marijuana based on nearly forty years of police experience. Officer Wright also placed a leaf in a field test kit, and the sample tested positive for marijuana.

¶ 12   The day following the robbery, police showed Weight and Thomas an array of six black and white photographs, one of which

featured Ellis. Weight felt uncomfortable using black and white pictures to identify the robber, so he did not choose a photograph. Thomas selected someone other than Ellis.

¶ 13   Months later, police called Weight, Thomas, and Thomas's mother in for a live lineup. Ellis was the only person who appeared in both the photograph array and the live lineup. Additionally, although Weight described the robber as having longer hair and no noticeable accent, four of the men in the eight-person lineup were bald and some spoke with accents. Upon hearing each man state "Get your belly on the ground," Weight "one hundred percent confirmed" that Ellis was the robber. Thomas again selected someone other than Ellis.

¶ 14   The State charged Ellis with one count of aggravated robbery, a first degree felony, in violation of Utah Code section 76-6-302. And because police found marijuana and handguns in Ellis's car, the State added one count of purchase, transfer, possession, or use of a firearm by a restricted person, a third degree felony, in violation of Utah Code section 76-10-503(3)(a).

¶ 15   Thomas testified at Ellis's preliminary hearing. She reiterated that while she drove along 1100 East, she saw a man run across the street and get into a four-door sedan. She thought it "really weird" that the man had crossed the street "in all the traffic." She also testified to giving the license plate number to the store clerk, who relayed it to the 911 operator.

¶ 16   Thomas was scheduled to testify on the first day of Ellis's trial, but she refused to attend because she needed to tend to her newborn. A week before trial she had given birth—several weeks prematurely—and her baby had come home from the hospital just three days before the trial began. The prosecutor explained to the district court that although both mother and baby were at home, "the baby is on oxygen, [and] has a heart monitor." Thomas refused to leave her newborn to testify at the trial, and the prosecutor argued that the only way Thomas would testify was if he "haul[ed] her to court," a position he "found to be untenable."

¶ 17   The State moved to admit Thomas's preliminary hearing testimony because defense counsel had cross-examined her at the prior hearing. Defense counsel objected to the transcript's admission, arguing that certain issues were not brought up during the preliminary hearing and that Ellis had a right to cross-examine Thomas at trial. Ellis's counsel requested a continuance, but the prosecutor resisted, arguing that the case had already been continued several times and all the State's witnesses were "ready to

go." The district court noted that its schedule was full for the next several months, so the trial, if continued, would be pushed back several months.

¶ 18 The court ultimately held Thomas to be "unavailable" under rule 804(a)(4) of the Utah Rules of Evidence. Ellis's counsel argued that the rule required that a witness be permanently unavailable because of illness, but the court noted that the language of the rule required only an "existing" illness. The court ruled that 804(a)(4) unavailability "does not have to be permanent[;] it's just not available today."

¶ 19 The prosecution read Thomas's preliminary hearing testimony to the jury at trial. Defense counsel renewed his objection to Thomas's testimony after the jury had heard it, but the court again overruled the objection. The jury also heard testimony from the store clerk and from the police officers who stopped and searched Ellis's vehicle.

¶ 20 Officer Wright testified in support of the possession of a firearm by a restricted person charge. He gave his opinion that, as a police officer with nearly forty years' experience, the plant-like substance found in Ellis's pocket was marijuana. He also testified that he placed a sample of the substance into the field test kit, and the sample tested positive for marijuana. He explained the steps he takes when performing the field test and stated that he performed those exact steps with the substance found on Ellis. On cross-examination Officer Wright admitted that although he had "probably" performed this test more than one hundred times during his career, he did not understand the science behind the test kit. He could not identify any substances that could result in a false positive. At the close of Officer Wright's testimony, defense counsel moved to strike the testimony for failing "scientific muster" and for lacking foundation.

¶ 21 The jury found Ellis guilty on both counts. The court subsequently sentenced him to an indeterminate sentence of five years to life on the aggravated robbery charge and zero to five years on the possession of a firearm charge, both sentences to run concurrently.

II

¶ 22 Ellis seeks reversal of both of the convictions entered against him. He challenges the aggravated robbery conviction on the ground that the preliminary hearing testimony of Brandy Thomas was admitted in violation of rule 804 of the Utah Rules of Evidence and the Confrontation Clause of the United States Constitution. Ellis

also challenges the possession of a firearm conviction. On this count Ellis claims error in the admission of testimony regarding field test results, offered to confirm that a substance found on Ellis was marijuana. And he thus asserts a right to a new trial on both of the charges against him.

¶ 23 We reverse the aggravated robbery conviction, finding reversible error under rule 804 without reaching Ellis's constitutional challenge under the Confrontation Clause. We affirm the possession conviction on the basis of our determination of harmless error.

A

¶ 24 Brandy Thomas's preliminary hearing testimony was hearsay. It was therefore admissible only if qualified under an exception to the bar on hearsay in our rules of evidence. The question presented here is whether this testimony could meet the standards for a hearsay exception in rule 804. In invoking that rule at trial the State asserted that Thomas was "unavailable as a witness" under rule 804(a) and that the standards in rule 804(b)(1) were met — that Thomas's testimony was given in a prior hearing and Ellis had "an opportunity and similar motive to develop it" by cross-examination at the preliminary hearing. *See* UTAH R. EVID. 804(b)(1).

¶ 25 The district court found these standards to be satisfied. It deemed Thomas "unavailable" under rule 804(a)(4) and found that Ellis had an "opportunity and similar motive" to develop cross-examination at the preliminary hearing. We disagree on both counts. We conclude that Thomas was not unavailable and that Ellis did not have a similar motive for cross-examination at the preliminary hearing. And we reverse because we conclude that this error was a material one.

1

¶ 26 Rule 804(a) sets forth criteria for deeming a declarant "unavailable as a witness." UTAH R. EVID. 804(a). It says that a declarant is unavailable if she "(1) is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies; (2) refuses to testify about the subject matter despite a court order to do so; (3) testifies to not remembering the subject matter; (4) cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness; or (5) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance." *Id.*

¶ 27 The trial court found that Thomas was unavailable under subsection (4). It noted that Thomas had a newborn baby with a "then-existing" illness. And because the baby's condition was a serious one, to which the mother (Thomas) had understandably indicated an intent to attend to on the date of the scheduled trial, the court found that Thomas was unavailable. In so doing the court rendered an interpretation of the standard set forth in subsection (4). It said that the reference to "then-existing" illness requires only a showing that the witness is ailing and "not available *today* [on the date scheduled for trial]." (Emphasis added.) And because it was apparently conceded that Thomas was unwilling to leave her baby's side in the baby's then-current condition, the court found Thomas unavailable without further inquiry into the expected length of the condition or the possibility of Thomas appearing to testify at a later date.

¶ 28 This was error. Rule 804(a)(4) admittedly speaks of a "then-existing infirmity, physical illness, or mental illness." And unlike subsection (5), subsection (4) does not make express reference to attempts, "by process or other reasonable means, to procure the declarant's attendance." *Id.* 804(a)(4)–(5). But that does not mean that any fleeting illness can be deemed to render a witness "unavailable" under subsection (4). *Unavailability* is a term of art. And in the context of rule 804(a), we think it clear that the notion of *unavailability* implies more than a mere inability to appear on an isolated date on which the trial happens to be scheduled.

¶ 29 The various subsections of rule 804(a) share at least one component in common—they all involve a substantial barrier to the witness testifying not just on an isolated date but over an extended period of time. *See id.* 804(a)(1) (witness unavailable if "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies"); *id.* 804(a)(2) (witness unavailable who "refuses to testify about the subject matter despite a court order to do so"); *id.* 804(a)(3) (witness unavailable if she "testifies to not remembering the subject matter"). We read rule 804(a)(4) in light of these surrounding provisions. In context, a witness is not unavailable due to an illness just because she cannot appear on the precise date when the trial has been scheduled.

¶ 30 To establish a witness's unavailability under subsection (4) the proponent must show that the witness "*cannot* be present or testify at *the trial*." *Id.* 804(a)(4) (emphasis added). If a witness has a minor or fleeting illness that interferes with her ability to be present on an isolated date, we would not say that she *cannot* be present at *the trial*. Unavailability implies a more substantial, lasting barrier to

participation at trial. It can be said that a witness cannot be present at the trial due to illness only when the illness is of sufficient severity and duration that the witness is unable to be present over a period of time within which the trial reasonably could be held.

¶ 31   Other courts have so held. In assessing whether an illness prevents a witness from attending trial the court "must consider both the duration and the severity of the illness." *Burns v. Clusen*, 798 F.2d 931, 937 (7th Cir. 1986). Thus, the question is not just whether the witness is dealing with an illness that prevents her from attending trial "today," as the district court here concluded. If the defendant does not object to a continuance and a reasonable continuance would allow the witness to attend, then the witness cannot be said to be unavailable. *See United States v. McGowan*, 590 F.3d 446, 455 (7th Cir. 2009) ("The duration of the illness need only be in probability long enough so that . . . the trial cannot be postponed." (citation omitted)).

¶ 32   The illness at issue here was a further step removed. Brandy Thomas herself was not suffering from an illness; her unavailability was due to her need to care for her newborn baby. That alone does not necessarily foreclose the applicability of subsection (4). The rule's reference to a "then-existing infirmity, physical illness, or mental illness" conceivably could be understood to encompass the need to care for *another's* illness.[1] But it certainly is not enough to just allege that a witness is unavailable due to her need to care for another. A further showing would be necessary. At a minimum, the proponent of the testimony would have to show that the witness's caretaker responsibility is critical and that that responsibility renders the witness unavailable for an extended period of time.

¶ 33   No such showing was made here. As the State notes, the baby's condition was apparent—the baby was born prematurely and was on oxygen and a heart monitor. That was enough to establish the existence of a severe health condition. But there was no inquiry into the likely duration of the condition, or into the possibility that someone could take Thomas's place in caring for the baby at some point during the reasonable time within which a trial could be held. And the failure of proof on those points is fatal.

---

[1] We do not resolve that question conclusively here, as an answer is not necessary to our resolution of this case.

¶ 34 The State says that "the prosecutor could not tell the court whether the baby's condition was long- or short-term." But that just highlights the problem. It was the prosecution's burden to tell the court whether the baby's condition was long- or short-term and whether Thomas was unavailable during the period in which the trial could reasonably be held. *See State v. Barela*, 779 P.2d 1140, 1142 (Utah Ct. App. 1989) (the proponent of the statement "bears the burden of establishing unavailability by competent evidence"). The absence of any proof on these points means that Brandy Thomas was not shown to be unavailable under rule 804(a)(4).

2

¶ 35 Rule 804(b) identifies categories of hearsay that are admissible when a witness is unavailable to testify at trial. The operative exception at issue here is in rule 804(b)(1). That exception applies when the hearsay consists of "[f]ormer [t]estimony" that (A) was given by "a witness at a trial, hearing, or lawful deposition," and (B) "is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination." UTAH R. EVID. 804(b)(1)(A)–(B).

¶ 36 The district court admitted Brandy Thomas's preliminary hearing testimony under this exception. It found that Ellis had a sufficient "opportunity and similar motive" to develop Thomas's testimony under cross-examination at the preliminary hearing. And it accordingly concluded that the standard in rule 804(b)(1) was satisfied.

¶ 37 That conclusion was understandable under our precedent at the time of the trial in this case. Our decision in *State v. Brooks* held that rule 804 does not bar "testimony given in a preliminary hearing from being admitted at trial." 638 P.2d 537, 541 (Utah 1981). Thus, *Brooks* provides a basis for the conclusion that Ellis had a sufficient opportunity and motive to develop Brandy Thomas's testimony on cross-examination at the preliminary hearing. And if *Brooks* were good law we would have to agree with the district court's analysis on this point.

¶ 38 Our *Brooks* decision has been overtaken, however. In *State v. Goins*, we found that the premises of the *Brooks* decision had been overtaken by a constitutional amendment—an amendment limiting "'the function of [preliminary] examination . . . to determining whether probable cause exists.'" 2017 UT 61, ¶ 31, --- P.3d --- (alterations in original) (quoting UTAH CONST. art. I, § 12). In light of that amendment, our *Goins* opinion concluded that "the blanket statement we issued in *Brooks* no longer rings true." *Id.* ¶ 32.

¶ 39 In *Goins* we recognized that "magistrates can, in some limited ways, assess credibility at a preliminary hearing." *Id.* ¶ 33. But we noted that the "reality of practice" in "many, if not most," cases is that defense counsel will lack the motive to utilize cross-examination in the way it could be employed at trial. *Id.* ¶ 34. Thus, our *Goins* decision stopped short of holding that "counsel never has the same motive to develop testimony at a preliminary hearing as at trial." *Id.* ¶ 35. But we identified some common limitations on cross-examination at a preliminary hearing. And we conditioned the admissibility of preliminary hearing testimony on a showing that "defense counsel really did possess the same motive and was permitted a full opportunity for cross-examination at the preliminary hearing"—a showing that we conceded "might prove rare." *Id.* ¶ 36.

¶ 40 Ellis is entitled to the benefit of the *Goins* analysis. *See State v. Guard*, 2015 UT 96, ¶ 67, 371 P.3d 1 (providing for "retroactive application to all cases pending on direct review of new rules of criminal procedure announced in judicial decisions"). And *Goins* forecloses the admissibility of the Thomas preliminary hearing testimony. As in *Goins*, we conclude that "we have no basis to conclude that [Ellis's] counsel's preliminary hearing motive to cross-examine was similar to what would have existed at trial." *Goins*, 2017 UT 61, ¶ 46. And we therefore hold that the district court erred in admitting this testimony under rule 804(b)(1).

3

¶ 41 A determination of error in admitting Thomas's preliminary hearing testimony is not alone enough to sustain a reversal. We must also find that error prejudicial. Prejudice in this setting requires a showing of a "reasonable likelihood" that the decision to admit Thomas's preliminary hearing testimony altered the jury verdict. *See State v. Richardson*, 2013 UT 50, ¶ 40, 308 P.3d 526 (errors in interpreting rules of evidence require reversal when "there is a 'reasonable likelihood' that the verdict would have been different" (citation omitted)).

¶ 42 Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error. In this case, for example, Ellis asks us to assess the likely outcome of a trial in which Thomas's preliminary hearing testimony is eliminated and the jury is left to consider the remainder of the prosecution's case. We consider

that counterfactual,[2] and we conclude that a jury in these circumstances is reasonably likely to have reached a different verdict.

¶ 43  The prosecution characterized Thomas as "a key witness" whose testimony was crucial to a "viable" prosecution. And we agree. Thomas provided key pieces of evidence that the jury likely credited. Most important, perhaps, was the crucial information Thomas provided about what occurred after the clerk lost sight of the robber. The prosecution emphasized this testimony during closing argument. And we think the verdict might well have been different without Thomas's testimony.

¶ 44  Without Thomas's testimony the jury would have heard that an unknown witness had relayed the plate number to Weight. And defense counsel could have exploited this uncertainty. The jury would then have been left in the dark about the identity of the witness, whether she had personal knowledge, what she actually saw, how she transcribed the plate number, and whether she accurately conveyed the information to the store clerk. In sum, the jury could have doubted the accuracy of the license plate number that led the police to stop Ellis's car.

¶ 45  Thomas was also the only witness who could testify that the robber fled in a car. The store clerk last saw the robber escaping on foot. Thus, Thomas was the crucial link for what occurred after Weight lost sight of the robber, providing her observations that a man got into the same car that police later intercepted. The absence of these factual connections could easily have caused the jury to reasonably doubt Ellis's guilt. For that reason we find that the district court's error was prejudicial, and thus that Ellis is entitled to a new trial on the aggravated robbery charge.

B

---

2 This may not be the only way to frame the counterfactual prejudice analysis in a case like this one. An alternative hypothetical might inquire into the likely outcome of a trial in which Thomas testifies in person (after a continuance) and is subject to cross-examination—as that is another way to frame the alternative universe in which there is no error in allowing the preliminary hearing testimony into evidence. But the parties here have framed their arguments in terms of the evidence remaining after the elimination of the Thomas testimony, and our analysis follows their lead.

¶ 46 When police stopped Ellis at the 7-Eleven convenience store they found a leafy substance in Ellis's pocket. Officer Wright later identified that substance as marijuana. Wright offered two grounds for his conclusion that the leafy substance was marijuana: (1) the results of a field test and (2) Wright's observations based on his experience and training over several decades as a police officer.

¶ 47 Ellis challenges the first of these grounds for the officer's testimony. Because Officer Wright was unable to explain the science behind the test and could not identify substances that might result in a false positive, Ellis claims that the field test results should not have been admitted as evidence. The State does not defend the propriety of the field test evidence but insists that any error in admitting this testimony was harmless.

¶ 48 We agree. Officer Wright testified that he was trained to identify marijuana in the police academy in 1976 and later by the California Narcotics Association. He also explained that he had worked as an officer for thirty-nine years and had significant experience with marijuana. And Wright's identification of marijuana, in his words, was "almost exclusively" based on "just looking [at] and smelling" the substance.

¶ 49 We think the jury could have credited—and likely did credit—this testimony as independently sufficient. We see no reason to doubt that a jury would question a veteran police officer's ability to identify marijuana from its look, feel, and smell, especially one who has been specially trained on multiple occasions for just such a task. And for that reason we think the admission of testimony about field test results was harmless.

### III

¶ 50 For the above reasons we find reversible error in the admission of Thomas's preliminary hearing testimony but not in the decision to allow Officer Wright to testify about field test results. We accordingly affirm the possession of a firearm conviction but reverse the aggravated robbery conviction and remand for a new trial.

––––––––––––

JUSTICE HIMONAS, concurring:

¶ 51 I concur in every aspect of Associate Chief Justice Lee's opinion. As expressed by the Associate Chief Justice, it was obvious error for the district court to find Ms. Thomas unavailable. And that error wasn't harmless—had Ms. Thomas's preliminary hearing testimony been excluded, or had the trial been postponed until Ms.

Thomas could appear and be subject to cross examination, there's a reasonable likelihood that the jury's verdict would have been different.

¶ 52 I write separately to highlight an additional consideration militating against finding the district court's error harmless. In the course of asking the district court to admit Ms. Thomas's preliminary hearing testimony, the line prosecutor assigned to this case stated that, in his view, Ms. Thomas was "a key witness." He called her an "essential witness[]" and averred that she was so critical to the State's case that trial could "not proceed without [Ms. Thomas's testimony because] . . . the case is just not viable without [that testimony]."

¶ 53 On appeal, however, the State urges us to find that admitting Ms. Thomas's preliminary hearing testimony was harmless error. That is, the State urges us to conclude that the prosecutor below—an experienced practitioner who had lived closely with this case in the run up to trial—was mistaken when he told the district court that the State could not, in good faith, proceed to trial without Ms. Thomas's testimony.

¶ 54 There is, of course, nothing improper about how the State has proceeded here. Far from it—the State ably presented its argument for harmlessness on appeal, and there's absolutely no indication in the record that the trial prosecutor misrepresented his view of the importance of Ms. Thomas's testimony. Additionally, there are surely many circumstances in which we should not hold the State to the line prosecutor's pretrial assessment of a witness's importance. The evidence after trial almost always looks different than it looked before—sometimes radically so, sometimes (like here) only in the details of what was elicited at trial—so it's possible that evidence a prosecutor might think critically important before trial has started appears insignificant after all the evidence is in.

¶ 55 But when a prosecutor has stated their belief that evidence is important, I'd tread carefully before finding any error in admitting it to be harmless. I'm concerned about the effect a finding of harmlessness under these circumstances would have on both the public's perception of fairness and the incentives governing prosecutorial choices.

¶ 56 As I've said, the State's conduct in this case is beyond reproach. But what message would it send the public (including those caught up in the criminal justice system) if our trial courts were to regularly admit testimony based, in part, on the State's

representation that it's crucial, only to have our appellate courts affirm the resulting conviction because the error in admitting the testimony was harmless? "Yes, the evidence was absolutely crucial *before* your conviction. And, yes, it was error to admit it. But the difference now is that you've been convicted. Now it's clear the evidence was unimportant. Now the error is of no consequence at all." This smacks of Kafka.

¶ 57   And what about future prosecutors? Every time we declare an error to be harmless, the potential effect is to "encourage the State to [solicit] it with impunity." *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989) (en banc), *overruled by Snowden v. State*, 353 S.W.3d 815 (Tex. Crim. App. 2011); *see also Goodwin v. State*, 751 So. 2d 537, 546 (Fla. 1999) (harmless error analysis should proceed with an eye toward "providing an incentive on the part of the State, as beneficiary of the error, to refrain from causing error to occur in the trial of a case"); *cf. In re Janet S.*, 712 N.E.2d 422, 424 (Ill. App. Ct. 1999) ("To conclude that [the State's failure to make an effort to locate exculpatory evidence] is harmless error could encourage the State to avoid looking for such documents and then argue after the fact that such a search would have been a waste of time."). Ex ante, the more willing an appellate court is to find an error harmless despite a prosecutor's contrary representations to the trial court, the greater the incentive for prosecutors to make such representations — representations that cannot help but have an effect on the likelihood that a court will erroneously allow the evidence in. We should take care to ensure that the doctrines we apply on appeal don't create an incentive structure that's reasonably likely to increase the overall incidence of error below.

––––––––––––