**2025 UT App 30**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MAUREN BETH WALL,
Appellant.

Opinion
No. 20220835-CA
Filed March 6, 2025

Second District Court, Ogden Department
The Honorable Reuben J. Renstrom
No. 211900117

Emily Adams and Rachel Phillips Ainscough,
Attorneys for Appellant

Derek E. Brown and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1     A jury convicted Mauren Beth Wall of aggravated burglary, aggravated robbery, aggravated assault, possession of a firearm by a restricted person, and obstruction of justice. She appeals her convictions, asserting that her trial counsel rendered constitutionally ineffective assistance and that the trial court improperly instructed the jury regarding reasonable doubt. We reject Wall's arguments and affirm her convictions.

BACKGROUND[1]

¶2     One day, Wall and her friend Dana drove together to the house where Wall's friend Jessica lived. Wall told Dana that Jessica "owed her money" and that Jessica was in possession of a "car part" that belonged to Wall. Wall also believed that Jessica was in possession of "some cellphones" that Wall had purchased and that Wall believed belonged to her. The purpose of Wall's visit was to try to obtain these items from Jessica's house. Earlier that day, Wall had come to Dana's place of residence with a "little" "black gun" and had "brandished" that gun in front of Dana's friend, scaring the friend; Dana was concerned about how Wall was acting that day and for that reason agreed to accompany her to Jessica's house, hoping that she could talk Wall out of "doing something stupid."

¶3     Jessica rented a basement room from a woman named Connie, and Jessica lived in that room with her boyfriend, Martin. Connie's daughter also lived in the house, and she was sometimes visited by her friend Zack. When Wall and Dana arrived at the house on the day in question, they observed that Jessica was not there; according to Dana, Wall nevertheless "went in the house" while Dana waited in the car.

¶4     About fifteen or twenty minutes later, Jessica arrived, accompanied by her friend Tracie. Jessica and Tracie had left Jessica's room locked and the light off when they left the house earlier that day, but when they returned they observed that the bedroom light was on and that the room's outside window—

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up).

which was ordinarily covered with a sheet of plastic—was "open" and that the sheet of plastic had been removed. Tracie testified that "it looked like somebody had crawled through" the window to get into the bedroom. Both Jessica and Tracie observed that Martin's "hoverboard"—which had been inside the bedroom when they left—was now outside the window. Tracie went outside, picked up the hoverboard, and passed it through the window to Jessica, who remained in the bedroom; when Jessica turned around, she saw Wall "standing at the doorway" of the bedroom. Jessica asked Wall to leave the house, and Wall responded by "grabb[ing] the hoverboard" and trying to take it from Jessica. An "altercation" ensued in which words were exchanged and the women "kind of wrestled over" the hoverboard. At one point during the tussle, Jessica saw Wall "[stand] back and put her hand on her waist," an action that concerned Jessica because she knew that Wall owned and often carried a gun. On at least one previous occasion, Wall had shown both Jessica and Tracie a "black, small handgun" that she had obtained. During the altercation, though, Jessica did not actually see a gun, but she understood Wall's gesture to her waist to be an indication that she had the gun on her person and was threatening to use it; indeed, Jessica was concerned enough to tell Wall, in the moment, "Don't take out your gun."

¶5    While Jessica apparently did not see Wall's gun in that moment, Tracie did. Tracie testified that Wall "pulled out a gun and aimed it towards" Jessica while Jessica was turned around and "facing away" from Wall, but with the barrel of the gun pointed downward "toward the ground."

¶6    Zack was also at the house that day, and he heard "some commotion" coming from the basement. He went downstairs to investigate, and he saw Jessica and Wall "facing each other" and "arguing." He heard Jessica say something like, "You need to put that gun away," but at that point he did not see a gun. He informed Wall that she needed to leave the premises. Wall then

proceeded upstairs, carrying a box; Zack followed five or six feet behind her to make sure she was leaving. At this point, Connie observed Wall coming up the stairs, with Zack behind her; Zack told Connie to "be careful" because "she's got a gun." Connie told Wall that "guns were not permitted in [her] home" and that she needed to leave; according to Connie, Wall responded by stating, "I'll take a gun anywhere I want to," and by pulling a "small black pistol" "out from underneath [the] box that she was carrying" and wav[ing the gun] around."

¶7 Wall then proceeded to leave the house, by way of the back door, with Zack following behind. While they were in the driveway of the house, with Wall about four or five feet ahead of him, Zack observed that "the clip fell out of the gun," and he instinctively kicked the clip "out of the way." At that point, the gun fired, and Zack was shot in the midsection, "right next to [his] belly button." Zack later testified that he never attempted to "grab a hold of the gun" and that he was never in possession of the gun. Connie heard a gunshot and saw Zack coming back toward the house, shouting that he'd been shot. Jessica called 911, and law enforcement and first responders soon arrived; Zack survived the shooting but was severely injured.

¶8 One responding officer noted that the plastic over Jessica's window "had been torn" and that "there was some hair on the tape . . . that had been torn off." The hair was black, the same color as Wall's hair. Wall had fled the scene in her car, and officers were able to locate her and search her vehicle. Officers then interviewed Wall, who stated that she had left the gun "near [a] dumpster" at a nearby convenience store. Upon searching the area, officers located two cellphones in the dumpster, a pipe used to smoke methamphetamine next to the dumpster, and a gun. Of particular note, the gun was found behind the dumpster, between the slats of a shipping pallet, and sitting on top of a holster. Detectives also interviewed Dana, who told them that Wall wanted to discard the

gun because she had a prior felony conviction and knew that she could not lawfully possess it.

¶9     After completing their investigation, officers arrested Wall, and the State later charged her with aggravated burglary, aggravated robbery, aggravated assault, possession of a firearm by a restricted person, and obstruction of justice.

¶10     Eventually, the case proceeded to a three-day jury trial. In support of its case, the State called as witnesses Zack, Jessica, Tracie, Connie, and Dana, as well as three law enforcement officers, all of whom testified as to the events described above. Dana also testified that, as she and Wall were driving away from the house on the day in question, she asked Wall "if she shot somebody," to which Wall responded, "Yes, I did. He threatened to take my gun away."

¶11     One of the testifying officers was a detective (Detective), who described, and played for the jury, certain recorded phone calls Wall had made to her parents from the jail. Detective testified that, during one call, Wall's mother asked, "So you had your gun with you and you shot him?," after which there was a twelve-second pause in the conversation before Wall finally said, "We got in a tussle and somebody had a gun and the guy got shot." Wall's mother then asked who had the gun, to which Wall responded, "I don't know, Mom." Detective also testified that, during another call, Wall's father said, "Wish you wouldn't have ever picked up that weapon," to which Wall responded, "I didn't claim it." Wall's trial counsel (Counsel) lodged no objections to Detective's testimony about the conversations between Wall and her parents.

¶12     After the State presented its case, Wall took the stand to testify in her defense. She told the jury that she did not go into Jessica's house prior to Jessica arriving at the house. Wall stated that, after she finally went into the house, Jessica "handed [her] the phones and the box [of car parts]." Wall also claimed that she "wasn't even near a hoverboard" and never tried to take the

hoverboard. In contrast to Zack's testimony, Wall stated that Zack "kind of appeared behind" her and "started yelling at" her. Wall testified that she wanted to leave the house, but that as she was "walking up the stairs" to leave, Zack was "pushing [her] back and pulling on [her] hoodie and calling [her] a dumb [expletive]." Wall stated that Zack continued to threaten her once they got outside onto the driveway and that she "felt attacked" because they were "in between a van and the wall," which was "just a really tight space." Wall testified that she "was trying to get to [her] car" when Zack "pushed [her] one last time," at which point Wall "turned around to face him." Wall claimed that she saw Zack "pull something out," which Wall recognized as a gun, and that she "dropped everything" and "grabbed at it." Wall testified that she and Zack were "going back and forth with [the gun]" when the gun went off, causing Zack to fall to the ground. Wall stated that, after the gun went off, she "picked everything up" and "ran to [her] car" to "get away." Wall acknowledged that, after leaving the house, she drove to a convenience store, where she "threw" the phones in the dumpster because "they were broken," and where she "tossed" the gun behind a pallet near the dumpster because she "just wanted it away from [her]" and because she knew she was not lawfully allowed to possess it.

¶13   After the evidence was presented, the trial court instructed the jury. With regard to "reasonable doubt," the court told the jury that "proof beyond a reasonable doubt is proof that leaves you *firmly convinced* of the defendant's guilt." (Emphasis added.) Earlier, Counsel had objected to this instruction, asserting that the phrase "firmly convinced" was "more closely aligned to preponderance of the evidence rather than 'beyond a reasonable doubt'" and that it was unconstitutionally vague. The State had argued in response that the "firmly convinced" language was derived from the Model Utah Jury Instructions and that this particular instruction had been approved by the Utah Supreme Court. The trial court overruled the objection. But while Counsel objected to the "reasonable doubt" instruction, Counsel lodged no

objection to the aggravated burglary instruction or to the instructions regarding jury unanimity. In particular, Counsel made no request for an instruction regarding affirmative defenses to theft or for an instruction regarding specific jury unanimity.

¶14 Thereafter, the attorneys presented closing arguments. As relevant here, the State argued that, with regard to the obstruction of justice charge, Wall had violated the relevant statute both by "hid[ing]" the gun and by "disposing" of the cell phones because "she didn't want those [items] tied back to her." And in its rebuttal argument, the State also claimed, in reference to the jail phone calls, that "[e]ven [Wall's] parents know that she was in possession of a gun in this case."

¶15 After deliberation, the jury found Wall guilty as charged on all five counts. Later, the trial court held a hearing to consider the appropriate sentence. At that hearing, Zack addressed the court and stated (among other things) that the shooting had "significantly changed [his] life." He told the court that he "walk[s] with a limp," that he "has pain constantly in [his] hip," and that he has "had to change careers" because he "can't do any hard labor anymore." Finally, he stated that the shooting also "change[d] [him] in a good way . . . because [he] got clean off drugs." At the end of the hearing, the court sentenced Wall to prison, with the sentences on the various convictions to run concurrently to each other. In making its decision, the court relied heavily on "the catastrophic injury" that Zack sustained from the shooting. And the court stated that it "just simply [did] not believe [Wall's] narrative" about the gun being Zack's and that it was "absolutely convinced" that Wall "went there with the gun" and that she "brandished" the gun.

¶16 Later, in connection with this appeal, Wall filed a motion—pursuant to rule 23B of the Utah Rules of Appellate Procedure—asking us to remand this case to the trial court for additional factfinding. In connection with that filing, Wall submitted

affidavits from Counsel and from Wall's sister indicating that, "[a] few days after" the sentencing hearing, Zack was admitted to jail, was "not limping," and was "so high that he had to be checked into the medical section to come down off of drugs."

ISSUES AND STANDARDS OF REVIEW

¶17    Wall now appeals her convictions, and she presents two issues for our review. First, Wall argues that Counsel rendered constitutionally ineffective assistance in several respects. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (cleaned up).

¶18    Second, Wall claims that the trial court erred in denying her request to remove the "firmly convinced" language from the reasonable doubt jury instruction. "A challenge to a jury instruction as incorrectly stating the law presents a question of law, which we review for correctness." *State v. Salgado*, 2018 UT App 139, ¶ 24, 427 P.3d 1228 (cleaned up).

ANALYSIS

I.  Ineffective Assistance of Counsel Claims

¶19    We turn first to Wall's claims that Counsel rendered ineffective assistance. To succeed on such claims, a defendant must make a two-part showing. First, "the defendant must show that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, "the defendant must show that the deficient performance

prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. A defendant must prove both elements to be successful. *See id*.

¶20    To demonstrate deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *State v. Popp*, 2019 UT App 173, ¶ 26, 453 P.3d 657 (cleaned up). In evaluating the reasonableness of counsel's actions, courts will often look to whether the actions counsel took were motivated by trial strategy. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871.

¶21    The second part of the test requires defendants to show that they were prejudiced by counsel's performance. "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing prejudice, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (cleaned up).

¶22    "Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out

differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86; *see also State v. Soto*, 2022 UT App 107, ¶ 25, 518 P.3d 157 ("Under a counterfactual analysis, we consider whether, in the absence of improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." (cleaned up)).

¶23 In this case, Wall makes four separate ineffective assistance arguments. First, she asserts that Counsel was ineffective for not requesting that an instruction on an affirmative defense to theft be added to the jury instructions regarding the aggravated burglary charge. Second, Wall argues that Counsel was ineffective for not requesting a specific unanimity instruction on the obstruction of justice charge. Third, Wall contends that Counsel rendered ineffective assistance by not objecting to Detective's testimony and to the State's closing argument about the jail phone calls between Wall and her parents. And fourth, Wall asserts that Counsel was ineffective for not filing a motion, pursuant to rule 60(b) of the Utah Rules of Civil Procedure, after the sentencing hearing; she asserts that Counsel later discovered that Zack had made material misrepresentations at that hearing about being clean from drugs and about having a limp. Wall acknowledges that the current record does not support this fourth claim, but she has filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking us to remand this case to the trial court for additional factfinding. We address each of Wall's four arguments, in turn.

A. Aggravated Burglary Instructions

¶24 Wall's first claim is that Counsel was ineffective for "failing [to] ensure that the jury was properly instructed on the [aggravated] burglary charge." Specifically, Wall asserts that the jury should have been instructed on one of the affirmative defenses to theft, namely, that a defendant is not guilty of theft if

the defendant "acted under an honest claim of right to the property or service involved" or "in the honest belief that the actor had the right to obtain or exercise control over the property or service in the manner the actor obtained or exercised control." Utah Code § 76-6-402(3). On this first claim, Wall fails to meet her burden of showing either deficient performance or prejudice.

¶25 Wall was not directly charged with theft. But she was charged with aggravated burglary, a crime that requires the State to prove that Wall had "enter[ed] or remain[ed] unlawfully in a building . . . with intent to commit" one of several enumerated crimes, including (as relevant here) theft or assault. *See id.* § 76-6-202(2). And here, the State argued that Wall had entered or remained in Jessica's house for the purpose of committing both theft and assault. With regard to theft specifically, the State presented evidence that Wall had taken, or at least tried to take, both the hoverboard and the cell phones.

¶26 The specific instruction Wall now asserts that Counsel should have asked for—regarding the "honest claim of right" defense to theft—thus would have applied to only one of at least three potential avenues the State put forward as to how Wall committed the relevant element of burglary. The instruction likely would have applied to the State's assertion that Wall committed burglary by entering or remaining in Jessica's house to take the cell phones: Wall testified that she believed the phones were hers and that she had a right to possess them. But it would have had no application to the State's assertion that Wall committed burglary by entering or remaining in Jessica's house to take the hoverboard, because there is no evidence that Wall believed the hoverboard belonged to her or that she had a right to take it. And it likewise would have had no application to the State's assertion that Wall committed burglary by entering or remaining in Jessica's house for the purpose of committing an assault.

¶27 But with regard to the one pathway to which the requested instruction might have been relevant, the instruction was somewhat inconsistent with Wall's own trial testimony regarding the phones. As Wall recounted the events, she didn't actually end up needing to take the phones after all because Jessica simply handed them over to Wall upon Wall's request.

¶28 Under these circumstances, a reasonable attorney could have decided to forgo asking for an instruction regarding the "honest claim of right" defense to theft. First, Counsel could reasonably have believed that relying on an "honest claim of right defense" regarding the phones was too inconsistent with Wall's testimony. In this vein, our supreme court has determined that an attorney's decision not to pursue alternative defenses does not necessarily indicate that counsel's performance was deficient. *See State v. Barela*, 2015 UT 22, ¶¶ 20–24, 349 P.3d 676 (concluding that it was not deficient performance for an attorney to elect not to advance "an alternative theory" that would have required the attorney "to openly entertain the possibility that his client was lying"); *see also State v. Campos*, 2013 UT App 213, ¶ 34, 309 P.3d 1160 (stating that "any election between inconsistent defenses is a legitimate exercise of trial strategy rather than ineffective assistance of counsel," and that, for instance, counsel "cannot be deemed ineffective for failing to request a jury instruction on diminished capacity when the defendant has denied all involvement in the crime" (cleaned up)). And second, Counsel might have reasonably believed that the instruction was not worth asking for because it would not have been applicable to the State's other two theories as to how Wall had committed burglary. Given these facts, Counsel could have reasonably chosen to forgo any request for an instruction regarding the "honest claim of right" defense to theft. *See State v. King*, 2024 UT App 151, ¶ 34, 559 P.3d 96 (stating that where "there was little, if anything, to be gained" by making the request, counsel "could reasonably have decided not to bother").

¶29 Moreover, Wall's claim also fails under a prejudice analysis because we perceive no reasonable probability that, in a hypothetical alternative trial in which the jury was instructed on the "honest claim of right" defense to theft, Wall would have obtained a better outcome on the aggravated burglary charge. Significant here is the jury's decision to convict Wall of aggravated robbery, a charge specifically aimed at the hoverboard incident and Wall's brandishing of her gun, thus indicating that the jury completely believed the core of the State's evidence regarding the other two pathways to aggravated burglary: that Wall had unlawfully tried to take the hoverboard and used a dangerous weapon in the course of that effort. A jury that was persuaded by that part of the State's case would almost certainly have been persuaded by the State's related arguments that Wall had committed burglary by remaining in the house for the purpose of taking the hoverboard or to commit an assault.

¶30 For all of these reasons, then, Counsel did not render constitutionally ineffective assistance by not requesting, in connection with the aggravated burglary charge, an additional instruction regarding this affirmative defense to theft.[2]

B.     Unanimity Instruction on Obstruction of Justice

¶31 Second, Wall asserts that Counsel was ineffective because he did not request a specific unanimity instruction on the obstruction of justice charge. Here, Wall claims that since the State charged her with only one count of obstruction of justice but offered evidence of two ways in which she had committed that

---

2. In her rule 23B motion, Wall included—apparently "[o]ut of an abundance of caution"—a declaration "making clear that [Counsel] did not ask for . . . affirmative defense jury instructions." We have assumed, for purposes of our analysis, that Counsel did indeed not make any such request, and therefore we need not consider further this portion of Wall's rule 23B motion.

crime, she was entitled to an instruction informing the jury that they needed to reach unanimous agreement as to which act Wall had committed that constituted obstruction of justice. On these facts, Wall was likely entitled to such an instruction had one been requested. We even assume, for purposes of our analysis but without deciding, that Counsel performed deficiently by not asking for such an instruction. But we nevertheless reject Wall's claim, because we conclude that even if such an instruction had been given, there is no reasonable probability that the verdict on the obstruction of justice charge would have been any different.

¶32    Wall admits that, after leaving Jessica's house on the day in question, she threw the phones in the dumpster and put the gun under a shipping pallet behind the dumpster. Thus, there is no dispute that Wall committed the acts in question. But Wall contends that she committed these acts without the requisite criminal intent: she claimed she threw the phones in the dumpster because they were broken and that she put the gun behind the dumpster because she was a felon and could not lawfully possess the gun and because she "wanted [the gun] away from [her]." For purposes of our analysis, we assume the veracity of Wall's assertions regarding her mental state. And we even assume, arguendo, that jurors might have believed that Wall was not guilty of obstructing justice for throwing the ostensibly broken phones into the dumpster. But even with those assumptions well in mind, Wall is still unquestionably guilty of obstruction of justice by placing the gun under the pallet behind the dumpster.

¶33    Utah's obstruction of justice statute states, in relevant part, that "an actor commits obstruction of justice . . . if the actor, with intent to hinder, delay, or prevent the investigation . . . of any person regarding conduct that constitutes a criminal offense, . . . conceals . . . an item or other thing." Utah Code § 76-8-306(2)(c). Thus, if Wall hid the gun behind the dumpster "with intent to hinder [or] delay" the investigation of crimes committed during the incident at Jessica's house—potentially including crimes

resulting from the shooting or crimes committed by mere possession of the gun—she committed obstruction of justice. *See State v. Paule*, 2024 UT 2, ¶ 55, 554 P.3d 844 ("[W]hen an obstruction of justice charge is predicated on the obstruction of an investigation, . . . the *mens rea* for that crime requires that a defendant have the specific intent to hinder an investigation into what the defendant believes is the *actus reus* of a separate crime.").

¶34 At the time Wall put the gun behind the dumpster, she knew that the gun had just been used to shoot Zack in the midsection and that Zack was injured. It is rather obvious, just from these facts, that law enforcement would soon be involved in the matter and would be investigating the circumstances of the shooting. And any such investigation would naturally lead officers to inquire about the weapon used in the shooting, the identity of the shooter, and the weapon's current location. Such queries would also naturally lead officers to investigate whether the shooter had lawfully possessed the weapon. Knowing all of these facts, and knowing that she was driving away from the scene of the shooting, Wall elected to hide the gun under a shipping pallet behind a convenience store dumpster, placed neatly atop its holster. And she did so, by her own admission, because she knew she wasn't permitted to have the gun and because she "just wanted it away from [her]."

¶35 On these facts, and even indulging the described assumptions, there is no reasonable probability that a factfinder would find Wall not guilty of obstruction of justice for hiding the gun. As noted above, prejudice analysis is "counterfactual" and requires us to envision a hypothetical alternative trial in which the jury received a specific unanimity instruction. *See State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86. For purposes of our analysis, we assume that, in such a trial, it is at least possible that a factfinder might conclude that Wall did not have the requisite mental state to be guilty of obstruction of justice by throwing into a dumpster broken phones that—according to her—had been freely given to

her. But we perceive no reasonable probability of an acquittal regarding Wall's actions in hiding the gun behind the dumpster. Stated another way, a properly instructed jury, knowing that it needs to reach unanimous agreement about which acts constituted obstruction of justice, would unanimously agree, on these facts, that Wall had committed that crime by carefully hiding behind the dumpster—for the express purpose of getting that gun away from her—the very gun that had just been used in a shooting and that she knew she could not lawfully possess. In other words, Wall's own admissions—viewed in context under these circumstances—constitute an acknowledgment of "specific intent to hinder an investigation" into what she believed was "the *actus reus* of a separate crime." *See Paule*, 2024 UT 2, ¶ 55.

¶36    We therefore reject Wall's second ineffective assistance claim on prejudice grounds.

C.    Jail Phone Calls

¶37    Next, Wall asserts that Counsel was ineffective for not objecting to either Detective's testimony or the State's closing argument about the jail phone calls between Wall and her parents. In particular, Wall asserts that the statements made and questions asked by Wall's parents—who are not "party opponents"—during those calls are hearsay, and that Counsel should have lodged a hearsay objection to at least those parts of the testimony and argument that concerned statements made and questions asked by Wall's parents. *See* Utah R. Evid. 801(c), (d)(2). But in our view, Counsel did not perform deficiently by opting not to lodge such objections.

¶38    Our evidentiary rules define "hearsay" as "a statement that . . . the declarant does not make while testifying at the current trial or hearing; and [that] a party offers in evidence to prove the truth of the matter asserted in the statement." *Id*. R. 801(c). But those same rules exempt statements made by an "opposing party" from the definition of hearsay. *Id.* R. 801(d)(2). Wall does not contend

that her own statements during the jail phone calls were inadmissible or that Counsel should have objected to their admission; in fact, she acknowledges that her own statements "were admissible because they were statements of a party opponent." But Wall argues that the comments made by her parents during the jail phone calls are hearsay and are not subject to any exception to the hearsay rule. The State, by contrast, asserts that the parents' comments were—at least originally—not admitted for the truth of the matters asserted but, instead, to show their effect on Wall and to provide context for the answers and responses Wall made to them.

¶39 We agree with the State that a reasonable attorney could have believed—at least during the initial presentation of the phone calls as part of Detective's testimony—that the parents' comments were not being offered for their truth and that they would be admissible at least to the extent of providing context for Wall's responses to them. For instance, at one point Wall's mother asked her, "So you had your gun with you and you shot him?" Immediately after discussing that statement with Detective, the State asked about Wall's reaction to that question, specifically inquiring of Detective whether there had been "a significant pause after" the mother's question, and Detective answered in the affirmative. The audio recording of the extent of that pause (which was twelve seconds long) and Wall's response thereafter ("We got in a tussle and somebody had a gun and the guy got shot.") was then played for the jury. At this point in the trial, Counsel could have reasonably assumed that the mother's question was being offered not for the truth of the matter asserted—that Wall owned a gun—but, instead, for the purpose of showing that Wall didn't take the opportunity to deny, to her own mother, that the gun used in the incident was hers.

¶40 The State also asked Detective about another question Wall's mother asked, namely, who had the gun during the encounter. In response to this question, Wall stated, "I don't

know, Mom." And during another call, Wall's father stated that he wished Wall "wouldn't have ever picked up that weapon," to which Wall responded, "I didn't claim it." Counsel could have similarly and reasonably believed that the parents' comments were admissible not for the truth of the matters asserted (e.g., that Wall's father truly did wish that Wall hadn't picked up the gun) but, instead, to provide context for Wall's responses.

¶41   Had Counsel made the objection Wall now asserts he should have made, the comments made by Wall's parents wouldn't have been stricken from the record; indeed, the best outcome Counsel could have hoped for would have been a limiting instruction informing the jury that it could not consider the parents' comments for their truth but that it could readily consider those comments as context for the responses Wall made to them. Counsel could have reasonably determined not to seek such an instruction, on the basis that it would have drawn additional attention to Wall's responses. *See State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96 ("[W]e have often held that decisions regarding whether to move to strike and seek a curative instruction are highly strategic ones that courts are loathe to second-guess."); *see also State v. Garrido*, 2013 UT App 245, ¶ 26, 314 P.3d 1014 ("Choosing to forgo a limiting instruction can be a reasonable decision to avoid drawing attention to unfavorable testimony."). We therefore conclude that Counsel did not perform deficiently when he opted not to object to Detective's testimony about the comments Wall's parents made during the phone calls.

¶42   Our analysis is slightly different regarding Counsel's decision not to object to the State's closing argument about those comments. While Counsel could reasonably have believed, during Detective's testimony, that the State was not offering the parents' comments for their truth, any such belief became unreasonable as soon as the prosecutor argued, during closing and in reference to the parents' comments during the jail phone calls, that "[e]ven [Wall's] parents know that she was in

possession of a gun in this case." At that point, it became apparent that the State was using Wall's mother's question—"So you took *your gun* with you and shot him?" (Emphasis added.)—as evidence that the gun was indeed Wall's.

¶43    But even here, Counsel was faced with the same difficult choice. Lodging an objection would not have resulted in the parents' comments being stricken from the record; it would simply have resulted in the court providing a limiting instruction telling the jury that it could not consider the parents' comments for their truth but only to provide context for Wall's admissible responses. And Counsel could have made the same decision at this point too; he could reasonably have determined not to seek such an instruction because he didn't want to draw additional attention to Wall's responses.[3] *See King*, 2024 UT App 151, ¶ 33; *see also Garrido*, 2013 UT App 245, ¶ 26.

¶44    For these reasons, Wall has not carried her burden of demonstrating that Counsel rendered ineffective assistance by

---

3. In addition, Wall has also failed to demonstrate prejudice on this claim. Many of the parents' comments were unremarkable and carried little possibility of prejudice. And even Wall's mother's question using the phrase "your gun" and implying that Wall's mother knew full well that Wall owned a gun was not, in the totality of the circumstances, prejudicial here. Several people—including Wall's friend Dana—testified that they saw Wall with a gun that day and at Jessica's house. At the sentencing hearing, the trial court offered its view that the evidence indicating that the gun was Wall's was quite overwhelming and that the court was "absolutely convinced" that Wall "went there with the gun" and that she "brandished" the gun. Under the circumstances, we see no reasonable probability of a different outcome in a hypothetical alternative trial in which Wall had requested, and been given, a limiting instruction regarding the parents' comments.

opting not to object to testimony and argument about the comments Wall's parents made during the jail phone calls.

D.    Rule 23B Motion

¶45    Finally, Wall argues that Counsel was ineffective because he did not file a motion for relief from judgment, pursuant to rule 60(b) of the Utah Rules of Civil Procedure, following the sentencing hearing. Wall acknowledges that this claim is not supported by documents currently in the record submitted to us. Instead, she has filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case to the trial court for additional factual findings regarding this claim. Specifically, Wall alleges that Zack was untruthful at the sentencing hearing when he told the court that he was not on drugs and that he walked with a limp because of the shooting. Wall contends that, had the court known the true facts at the time of the sentencing hearing, it wouldn't have sentenced her to prison and, instead, would have afforded her the privilege of probation. We are unpersuaded by Wall's arguments because any such motion would have been futile.

¶46    Rule 23B "provides a mechanism for criminal defendants to supplement the record with facts that are necessary for a finding of ineffective assistance of counsel but which do not appear in the record." *State v. Griffin*, 2015 UT 18, ¶ 17, 441 P.3d 1166. A "motion seeking rule 23B remand must meet several requirements: (1) it must be supported by affidavits alleging facts outside the existing record, (2) the alleged facts must be non-speculative, and (3) the alleged facts, if true, must establish both elements of a traditional ineffective-assistance claim, i.e., counsel's deficient performance and resulting prejudice." *State v. Tirado*, 2017 UT App 31, ¶ 14, 392 P.3d 926; *see also* Utah R. App. P. 23B(b).

¶47    In support of her motion, Wall submitted declarations from her sister and Counsel stating that Wall was told by jail guards

that, just a few days after the sentencing hearing, Zack was booked into the jail and "was not limping and . . . was high on drugs." Wall's sister stated that she had communicated with one of the guards, who confirmed these facts.

¶48    Wall argues that Counsel was ineffective for not asking the court, based on this information, to reconsider the sentence. For purposes of our analysis, we assume without deciding that a rule 60(b) motion is a proper procedural avenue in this context, that Counsel could have filed such a motion, and that rule 60(b)(3)—which concerns "misconduct of *an opposing party*" (emphasis added)—applies here in any event. *Cf. Utah v. Boyden*, 2019 UT 11, ¶¶ 24–37, 441 P.3d 737 (stating that "the State properly moved under [rule] 60(b)" in a criminal case (cleaned up)). But even indulging these assumptions, we nevertheless conclude that, even if Counsel had filed such a motion, there is no reasonable probability that it would have been granted or that Wall's sentence would have been altered.

¶49    Here, Wall had already stipulated that Zack suffered serious bodily injury due to the shooting. Additionally, evidence was presented at sentencing demonstrating that Zack required extensive medical care and almost died as a result of the shooting. And our review of the transcript of the sentencing hearing reveals that the court chiefly relied upon "the nature of the crime," as well as the "aggravated nature of" Zack's life-threatening internal injuries, in concluding that Wall should be sentenced to prison. The court did not once mention either Zack's limp or Zack's statement that he was clean and off of drugs.

¶50    Thus, there is no need for a remand for additional factual findings, because even if we assume, for purposes of our analysis, that the trial court on remand would make factual findings entirely in line with the affidavits Wall submitted in connection with her motion, we would be unable to conclude that Counsel rendered ineffective assistance by opting not to file a motion

asking the trial court to reconsider its sentence. We simply perceive no reasonable probability that the court would have changed its mind had such a motion been filed. *See State v. Orton*, 2024 UT App 140, ¶ 25, 558 P.3d 443 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (cleaned up)). On that basis, we deny Wall's rule 23B motion.

## II. Reasonable Doubt Instruction

¶51 Wall also presents one preserved issue for our review. She claims that the trial court erred in denying Counsel's request to remove the "firmly convinced" language from the jury instruction regarding reasonable doubt. But here, where the instruction in question came directly from the Model Utah Jury Instructions (MUJI) and has been approved by our supreme court, the trial court did not err by giving the challenged instruction.

¶52 Wall claimed at trial, and argues here, that the instruction's use of the words "firmly convinced" to describe the "beyond a reasonable doubt" standard is inadequate. This portion of Wall's brief is thorough and presents some good arguments that might, in an appropriate case, provide support for a trial judge's decision to give a reasonable doubt instruction that does not include the "firmly convinced" language. But even if we assume that the trial court here could have properly given the instruction Wall requested, it does not follow from that assumption that the court committed error in giving the instruction it gave.

¶53 The instruction in question here was taken directly from MUJI, and it informed the jury, in relevant part, that "proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt." The fact that the instruction came from MUJI is not necessarily dispositive; although the model instructions "provide guidance to attorneys and [trial] courts about how to instruct a jury," these instructions "are

merely advisory and do not necessarily represent correct statements of Utah law." *Meeks v. Peng*, 2024 UT 5, ¶ 36, 545 P.3d 226 (cleaned up). It is incumbent on the litigants and the trial court, in each case, to make sure that the instructions accurately convey the law, regardless of whether they come from MUJI.

¶54 But here, the particular instruction at issue has previously been approved by our supreme court. In *State v. Reyes*, 2005 UT 33, 116 P.3d 305, the court "exercise[d its] supervisory authority to promulgate for use in the courts of this state" a reasonable doubt instruction "proposed by the Federal Judicial Center," which it set forth in full in its opinion. *Id.* ¶ 37. Indeed, the court referred to this instruction as "a 'safe harbor' instruction" that, if given, would insulate a trial court from claims of error. *Id.* ¶ 38. The instruction the court gave in this case is substantively identical—including the "firmly convinced" language—to the "safe harbor" instruction approved in *Reyes*.

¶55 We are simply unwilling to ascribe error to a trial court's decision to give an instruction that our supreme court has specifically approved as a "safe harbor." On that basis, we reject Wall's claim that the court erred by giving the approved instruction containing the "firmly convinced" language.

CONCLUSION

¶56 Wall has not carried her burden of demonstrating that Counsel rendered ineffective assistance in any of the particulars she asserts. And the trial court did not err in giving a reasonable doubt instruction that has been approved by our supreme court.

¶57 Affirmed.

———————