**2025 UT App 147**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SEVERO GONZALO VINE,
Appellant.

Opinion
No. 20221058-CA
Filed October 17, 2025

Fourth District Court, Provo Department
The Honorable Kraig Powell
No. 211401981

Ann M. Taliaferro, Attorney for Appellant

Derek E. Brown and Tera J. Peterson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1     A jury convicted Severo Gonzalo Vine of committing forcible sodomy on his girlfriend. He appeals that conviction, asserting that his trial counsel rendered constitutionally ineffective assistance in various respects. For the reasons discussed, we reject Vine's arguments and affirm his conviction.

## BACKGROUND[1]

¶2     Vine and Lisa[2] met each other at an inpatient substance abuse rehabilitation center, became romantically involved, and started living together after they were released. During their two-plus-year relationship, they each struggled with drug use and had occasional brushes with the law, and their relationship was sometimes "rocky" and "contemptuous."

¶3     At one point during their relationship, they both ended up serving short jail sentences, and they happened to be released from jail on the same day. Later that day, they smoked methamphetamine together and went to Lisa's mother's house, where Lisa had a bedroom. Lisa often took medication in the evening for anxiety and insomnia, and that night she took "a little bit extra" because she was "really on edge" and wanted to sleep. Lisa and Vine went to sleep in Lisa's bedroom. At some point in the night, the two woke up and had consensual vaginal sex; Lisa fell asleep again afterward.

¶4     Sometime the next morning, Lisa noticed that her anus was feeling "really tender" and "sore," and she found dried blood on her anus. She thought the presence of blood was "weird" because it wasn't her "time of the month." Lisa then confronted Vine and asked him if he knew anything about the blood on her anus. Vine responded by telling Lisa that he "had sex with [her] while [she was] asleep" and that he had "put it in [her] anus." Lisa asked

---

1. In appeals following jury verdicts, "we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up). In so doing, "we present conflicting evidence only when necessary to understand issues raised on appeal." *Id.* (cleaned up).

2. A pseudonym.

Vine why he did that, and he responded, "Well, I was horny. What else did you expect me to do?"

¶5     Later that day, Lisa reviewed a series of video recordings that had been captured the previous night by a camera she had set up in her room. Lisa had set up the camera in the corner of the bedroom because she had suspected Vine was stealing from her. This camera automatically recorded video clips in twelve-second increments when triggered by motion or sound, with a five-minute "cooldown" period between each clip. The camera operated this way because Lisa had subscribed to a free service the camera company offered, instead of the paid service that permitted continuous footage. During the previous night, the camera had captured seven video clips, totaling less than two minutes, over a seventy-minute period. Each clip had a time stamp and had been recorded between 12:23 a.m. and 1:33 a.m. Lisa remembered going through the video clips "kind of quickly" at first, and during this first review she did not see anything "too crazy." But she was later encouraged to "look through every single" video again. And when she did so, she observed Vine doing things to her that she considered "not okay."

¶6     Eventually, Lisa filed a report with law enforcement, provided a witness statement, and showed a police officer the video clips. At law enforcement's request, Lisa transferred the clips onto a DVD and gave it to law enforcement. A detective (Detective) later interviewed Lisa and reviewed the video clips.

*Pretrial Proceedings*

¶7     The State later charged Vine with one count of forcible sodomy, a first-degree felony. At the preliminary hearing, the State moved to admit the DVD Lisa had provided to law enforcement containing the seven video clips. Vine's attorney (Counsel) objected, arguing that the videos lacked foundation to be admitted because Lisa had "self-selected" and "edited" the videos. Counsel noted that the videos showed "seven clips that

are less than a minute long" of activity within a seventy-minute time frame on the evening in question, and he argued that Lisa had not said "how she achieved the seven clips, [or] why there [were] . . . less than seven minutes of total video from this hour and [ten]-minute period." And he asserted that, "without knowing more . . . it would be unfair . . . for the court to consider [the clips] at this point of the proceedings."

¶8    The court sustained the objection under rules 403 and 901 of the Utah Rules of Evidence, but noted that it might reconsider the matter "if there were additional evidence . . . as to what the nature of the video [was], how it was created, [and] why it [was] broken up into so many brief segments over this period of time."

¶9    The State then requested a continuance to present additional foundation for the video clips, and the court granted the request. At the continued hearing, the State presented a supplemental statement from Lisa, in which she explained that the duration of the video clips and the gaps between them were attributable to the free subscription service provided by the camera company. Based on Lisa's explanation of the intermittent recordings, the court overruled Counsel's prior objection because, in the court's view, the "objection now goes to the weight of the evidence, not to its admissibility." At the conclusion of the preliminary hearing, the court bound Vine over for trial.

¶10   The day before the scheduled trial, Lisa provided the State with four memory cards, and she indicated that these cards may contain additional video footage from the night of the incident. After the State informed Vine and the court, Counsel moved for a continuance to allow him to review the data on the cards, and the court granted the motion. Detective subsequently reviewed the memory cards and found that there were video clips from dates before and after the date of the alleged events but that there were no additional clips from the date of the incident. Counsel represented to the court that at least three of the memory cards

had "no evidentiary value," but he said he was concerned about the "scores, if not hundreds of deleted files" on the fourth card. Counsel asked the State to provide Vine with a copy of a report that the State had generated about the memory card, which report included information about the video clips on the card, such as "when they were created," "last accessed," and "ultimately deleted." The State eventually provided the report, and Counsel represented at the next hearing that a defense expert was reviewing the information.

*Trial*

¶11    The trial was ultimately rescheduled for a three-day setting in August 2022. The State filed its notice of witnesses and proposed trial exhibits, which included the DVD containing the seven video clips. Counsel did not file any pretrial motion seeking to exclude the video clips. And at the final pretrial conference, Counsel stated that the defense was "prepared to go forward," noting that he had "received a copy of the State's jury instructions, witness list, [and] exhibit list." Counsel also represented that he didn't anticipate filing any further motions.

¶12    Trial then began as scheduled. In support of its case, the State called several witnesses, including Detective, Lisa, and a director of software engineering (Director) from the company that manufactured Lisa's camera.

¶13    During his testimony, Detective stated that Lisa had provided the DVD containing the seven video clips to the initial responding officer and that Detective himself reviewed the contents of the DVD. He discussed his review of the clips, and he offered his perception that Lisa appeared to be unconscious in the video and that Vine appeared to be "moving her body and manipulating her body in different ways and touching her sexually." Detective identified the individuals depicted in the video as Lisa and Vine. Detective also testified that Lisa had provided him with the four memory cards and that he had used

a special software program to analyze the cards, which allowed him to view the data on the cards without altering it. He explained that the memory cards contained cell phone data and several days' worth of video footage, but that "[n]one of the [memory] cards appeared to have anything that was directly relevant to the dates concerned" in this case. Detective also testified that he reviewed the "forensic download" report of the memory cards and that none of the deleted files appeared to be "directly relevant" to the date of the incident for which Vine was charged. On cross-examination, Detective testified that the video clips Lisa provided were given numerical titles but that the videos were not ordered chronologically. And he stated that the memory cards contained no video footage from the period spanning seven days before to nine days after the date of the alleged crime.

¶14   Lisa testified next. She provided background on her relationship with Vine, described the events on the day of the incident, and detailed her discovery of the blood the following morning as well as her confrontation with Vine and his admission that he had anal sex with her while she was asleep. In addition, she described her review of the video clips and her subsequent report to law enforcement. She testified that she had previously told Vine not to have sex with her while she was asleep, and she stated that she felt the need to do that because, on at least two occasions prior to the incident, she had awakened to Vine trying to have sex with her. After the first time this happened, she told Vine that his behavior was "not okay" and said, "Please, . . . don't do this while I'm asleep." After the second instance, she remembered telling him, "I told you this before, . . . this is a really big boundary for me, this is not okay, do not do this again."

¶15   Lisa identified the DVD that contained the video clips as the one she had given to law enforcement. She explained that she had downloaded the clips onto the DVD, and she confirmed that "these [were] the files that . . . [she] put onto th[e] DVD." She also explained why she set up the camera and why there were gaps in

the recordings, and she explained that she had gone back and re-reviewed the video clips after "talking to a friend." The court admitted the DVD into evidence without objection, and the State played the seven video clips for the jury. Lisa described some of the events that occurred while the videos were played, and during one clip, she recognized her voice where she "yelped" or "shouted" while Vine was "behind [her] doing things to [her]." Lisa confirmed that the videos "fairly and accurately represent[ed] what [she] viewed from [her] camera." As the clips were played for the jury, Counsel approached the bench and informed the court that there was audio for some of the clips that he did not believe was coming through. The court stated that it heard audio, and Counsel responded that he was "not hearing what [he] expected to hear." Counsel made no further objection.

¶16    On cross-examination, Counsel asked Lisa about her history of substance abuse and the occasions where she had failed to complete treatment programs. She testified that she had been in and out of various treatment facilities or sober living houses, but that she always got back with Vine afterward.

¶17    Counsel also questioned Lisa about her motive to review the video clips the second time. Specifically, Counsel asked Lisa if she had been directed to rewatch the clips in order to gather evidence for another case against Vine, rather than being prompted by a friend to do so. Counsel asked, "Do you remember telling [Detective] that you'd made some other complaints against [Vine] and a case officer asked you to review the footage for further domestic violence and that's when you found the footage of the sex offense?"

¶18    After this question, the State asked to approach the bench and told the court that it had instructed Lisa not to talk about the separate domestic violence case. The State explained that Vine had separate domestic violence charges pending against him for allegedly striking Lisa and that this incident had also been

captured on Lisa's camera. Counsel responded that he was "asking [Lisa] about prior inconsistent statements" and that in Detective's report Lisa was quoted as saying that she found the footage of the incident after the case manager for the domestic violence case asked her to re-review the footage. Counsel acknowledged that he "probably shouldn't have mentioned the word domestic violence" in his question, and he indicated that he had only wanted to impeach Lisa about the reason she re-reviewed the camera footage. After hearing the parties' arguments, the court stated that Counsel had "open[ed] the door" to the statement about the domestic violence incident, and it ruled that "the attorneys [would] be allowed to ask questions using the language of the police report." The court then asked one of the attorneys to read the sentence in the report aloud to the jury. In turn, the court instructed Lisa that she was "allowed to answer questions about that statement in the police report." Counsel later asked Lisa if she had been told to re-review the clips because of the domestic violence case, to which Lisa again responded that her re-review had been prompted by a friend.

¶19 At one point during cross-examination, Counsel asked Lisa whether she had told Detective that she ended her relationship with Vine the day after the incident. Lisa responded in the negative. When Counsel asked why Detective would have mentioned that in the report, Lisa responded that she and Vine had initially "decided to stay together" but that Vine "ended up getting arrested . . . a couple of days later . . . and he was in jail for a month." Counsel did not object to this response and moved on with his line of questioning.

¶20 After Lisa's testimony, the State called Director. Like Lisa, Director explained that for free subscription service accounts, the camera Lisa owned records a video of up to twelve seconds each time a motion or audio event occurs, but usually only records one such video every five minutes. Director testified that the audio quality of the recordings is "not perfect, especially for those

events happening far away." And on cross-examination, Director explained that any motion that occurs during the five-minute "cooldown" period will not be recorded but that if there is a "technical issue," where the "camera gets rebooted for some reason or reset, there is a possibility" a second video could be recorded "less than [five] minutes" after the last one. After this testimony, the State rested its case.

*Jury Instructions and Vine's Defense*

¶21 During the second day of trial, the court and the attorneys discussed jury instructions. As relevant here, the court addressed the State's proposed jury instructions regarding the consent element of forcible sodomy. Specifically, the State wanted the consent instruction to include the following theory of nonconsent listed in statute: that "Vine knew that [Lisa] was, (a) unconscious, (b) unaware that the act was occurring, or (c) physically unable to resist." *See* Utah Code § 76-5-406(2)(e). By contrast, Counsel proposed a more robust list of nonconsent theories than the State because, in Counsel's view, the State's proposal "limit[ed] it too much in what the jury would be able to consider." Thus, Counsel proposed that the instruction incorporate eight theories of nonconsent, all from the consent statute and the Model Utah Jury Instructions (MUJI). For example, regarding an "expressed lack of consent through words or conduct" theory, Counsel explained that "[t]here's 4,209 seconds of time that elapses between the start of the video clips and the end of the video clips," yet only "72 seconds of that time period" were in evidence. As a result, Counsel argued that because there was a gap in "what went on during the other 4,100 and some odd seconds," the State "should have to prove beyond a reasonable doubt that [Lisa] expressed lack of consent through words or conduct or not." Counsel further explained that some of the other nonconsent theories in the statute should also be included because "the same type of argument would apply" to them.

¶22 Comparing the parties' proposals with the consent provisions in the relevant statute, the court ruled that it was "going to come down somewhere in the middle," meaning that it would "add more factors"—theories of nonconsent—as suggested by Counsel and "keep in many of the factors the State has suggested." The court explained that it was not going to incorporate all the theories that had been proposed by Counsel because that would be "absurd under some of these circumstances." In keeping with this ruling, the court gave separate instructions regarding the elements of forcible sodomy and regarding consent. The elements instruction read as follows:

> You cannot convict . . . unless based on the evidence you find beyond a reasonable doubt, each of the following elements:
>
> 1. Severo Gonzalo Vine;
>
> 2. Intentionally, knowingly or recklessly committed a sexual act involving any touching of the skin, however slight, of: a. the genitals of Severo Gonzalo Vine, and b. the anus of [Lisa];
>
> 3. Without [Lisa's] consent; and
>
> 4. Severo Gonzalo Vine acted: a. with knowledge that [Lisa] did not consent; or b. recklessly as to whether [Lisa] consented; and
>
> 5. At the time of the act, [Lisa] was 14 years old or older.

And the consent instruction read like this:

> The alleged sexual conduct is without consent of [Lisa] under any, all, or a combination of the following circumstances:

- [Lisa] expressed lack of consent through words or conduct;

- [Vine] overcame [Lisa] through the application of physical force or violence;

- [Vine] overcame [Lisa] through concealment or by the element of surprise;

- [Vine] knew that [Lisa] was unconscious, was unaware that the act was occurring or was physically unable to resist; and/or

- [Vine] knew that as a result of mental illness or defect, or for any other reason, [Lisa] was incapable at the time of the act of either understanding the nature of the act or of resisting it.

In deciding lack of consent, you are not limited to the circumstances listed above. You may also apply the common, ordinary meaning of consent to all of the facts and circumstances of this case.

¶23 After this discussion, Vine presented his defense, recalling Detective to the stand as his only witness. Among other things, Counsel elicited testimony that some of the video clips "were approximately five minutes apart," while "[o]thers were over 30 minutes apart." Detective reiterated that the video files were given numerical names but were not numbered in chronological order. And Counsel questioned Detective on whether Lisa had originally reported that she had found blood around her anus the morning after the incident.

¶24 After Detective's testimony, the defense rested; Vine did not testify. The court then provided the final jury instructions, including the instructions discussed above.

*Closing Arguments and Verdict*

¶25 The attorneys then gave closing arguments. The State argued that Lisa's lack of consent was evident from her actions in the video clips themselves. The State asserted that in the clips, Lisa was "lying there, lying asleep, not moving. . . . What she was doing was not being an active participant. She wasn't aware. She didn't know what was going on. She was asleep. You cannot consent when you're asleep." The State also pointed to Lisa's testimony where she had told Vine twice before the incident not to have sex with her while she was asleep.

¶26 During the defense's closing, Counsel argued that the State had failed to prove that Vine committed forcible sodomy, directing the jury's attention to the element of consent. Counsel noted that for more than two years, Vine and Lisa "pretty much lived together" and "had an intense sexual relationship." Counsel argued that the jury would "have to believe beyond a reasonable doubt that [Lisa] had withdrawn that consent at some point to not engage in this type of conduct." Counsel also argued that the video clips did not show forcible sodomy, asserting that Vine's penis could not be seen touching Lisa's anus in any of the clips. And Counsel contended that Lisa was not unconscious because the clips show her "changing positions" and if the volume on the recordings had been amplified, the jury would have heard "talking" and "audible voices." Counsel pointed out that there was "clearly some talking" in several of the video clips.

¶27 Counsel also questioned the reliability of the video clips. He argued that the clips covered "less than two percent of the actual time that elapsed between the very start of that first video and the very end of the last video," and thus, there was "no way of knowing what happened outside of those 72 seconds." Counsel asserted that Lisa "cherry-picked" the video clips before providing them to law enforcement. Counsel further argued that the video clips were likely edited because the files had been

renamed, the time between the clips varied, and the clips were out of chronological order. Counsel also pointed out that Lisa's memory cards were missing data from the two-week period surrounding the incident.

¶28　Counsel continued by questioning Lisa's credibility. He pointed to what he termed the "glaring inconsistency" that Lisa "made no mention of any blood" to law enforcement initially. Counsel also questioned how Lisa could have slept through the alleged anal sex when she had taken methamphetamine, which "she testified before" usually "made her feel alive and awake and alert when she used" it.

¶29　In rebuttal, the State argued that "consent to any sexual act or prior consensual activity" does not "constitute consent to any other sexual act." The State then replayed three of the video clips to show that Vine "knew [Lisa] wasn't consenting." In the first, the State argued that Vine "look[ed] directly at her to see if his action woke her up," and that he did that "two more times to see if she [was] awake." In the second, the State said that Vine "look[ed] at her to see if [she was] awake after [he was] engaging in his act." And in the final clip, the State argued that Vine "look[ed] at her again to see what she [was] doing, to see if [she was] going to wake up and tell him that this [was] not okay."

¶30　After deliberating, the jury found Vine guilty of forcible sodomy, and the court later sentenced Vine to prison.

ISSUES AND STANDARD OF REVIEW

¶31　Vine now appeals, asserting that he is entitled to a new trial because Counsel rendered constitutionally ineffective assistance in various respects. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law." *State v. Rivera*, 2022 UT App 44, ¶ 21, 509 P.3d 257.

ANALYSIS

¶32    To succeed on an ineffective assistance claim, Vine must make a two-part showing: (1) that Counsel's performance "fell below an objective standard of reasonableness," and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for [C]ounsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *accord State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. Failure to prove either component is fatal; "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up).

¶33    In this case, Vine claims that Counsel rendered ineffective assistance in three ways: (1) by not challenging the admissibility of the video clips under a number of evidentiary rules; (2) by not objecting to—or by opening the door to—prior-bad-acts evidence; and (3) by not ensuring that the jury was properly instructed as to the consent element of forcible sodomy. For the reasons discussed, we reject each of Vine's ineffective assistance claims.[3]

_____

3. Vine also argues that, when viewed together, the cumulative effect of Counsel's deficiencies resulted in prejudice. "Under the doctrine of cumulative prejudice, we will reverse if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. King*, 2017 UT App 43, ¶ 38, 392 P.3d 997 (cleaned up). Because we ultimately conclude that Counsel performed deficiently in only one of the ways Vine asserts, we need not address the cumulative effect of multiple

(continued…)

## I. The Video Clips

¶34 Vine first argues that Counsel provided ineffective assistance by failing to challenge the admissibility of the video clips under several evidentiary rules.[4] This claim fails because Vine has not demonstrated that Counsel performed deficiently.

### A. Authenticity

¶35 Vine first argues that Counsel should have sought to exclude the video clips for lack of authenticity under rule 901 of the Utah Rules of Evidence.

---

deficiencies. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 48, 428 P.3d 1038 (stating that "a single accumulable error cannot warrant reversal under the cumulative error doctrine").

4. In his brief, Vine relies on a theme that the video evidence was generally unreliable and untrustworthy, and in doing so he points to a number of purported flaws: that Lisa had been "in complete control over the original recordings," that she had selected the clips to provide the State, that the "State could not show the evidence had not been tampered with," that the gaps between the clips rendered the evidence unreliable because the jury had to "speculate" about what occurred in the intervening time, that the audio quality was poor, and that the memory cards may have included important data that had been deleted. But we note that Vine has selected specific evidentiary rules as the bases for this ineffective assistance of counsel claim. So we address his arguments under those rules, without addressing every other argument or implication contained in Vine's brief in connection with the video evidence. *See State v. Draper*, 2024 UT App 152, ¶ 124, 560 P.3d 122 ("An appellate court has discretion as to the nature and extent of the opinions it renders and we need not address in writing each and every argument, issue, or claim raised and properly before us on appeal." (cleaned up)).

¶36 Our evidentiary rules require that an item of evidence be properly authenticated, a process that requires the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Utah R. Evid. 901(a). "Proper authentication does not require conclusive proof, and the proponent has to make only a prima facie showing of authenticity." *State v. Welsh*, 2022 UT App 112, ¶ 36, 519 P.3d 572 (cleaned up). The "process of authentication must be distinguished from a finding of authenticity." *State v. Jacques*, 924 P.2d 898, 901 (Utah Ct. App. 1996). "The district court is responsible for the process of authentication, whereby it assesses whether there is evidence sufficient to support a jury finding of authenticity." *Welsh*, 2022 UT App 112, ¶ 37 (cleaned up). But "the jury is ultimately responsible for determining whether the evidence is in fact authentic once the evidence is admitted." *Jacques*, 924 P.2d at 901.

¶37 In this case, Counsel could have reasonably decided that any authenticity objection would be readily overruled. Lisa testified that she had set up the camera in her bedroom, subscribed to the free service provided by the camera company, and transferred the video clips onto the DVD that she provided to law enforcement. She also confirmed at trial that the DVD contained the video clips that she had viewed. In short, she provided sufficient testimony for the jury to find that the video clips were what the State purported them to be.

¶38 We also note that Counsel did in fact raise an authenticity challenge at the preliminary hearing, and the court initially sustained his objection. Yet in so ruling, the court explained that it would reconsider the matter "if there were additional evidence . . . as to what the nature of the video [was], how it was created, [and] why it [was] broken up into so many brief segments over this period of time." Because the State gathered more evidence to cure these deficiencies, and because the court then considered the

clips sufficiently authenticated, Counsel could have reasonably decided that any renewed authenticity motion would fail.

¶39   Thus, Vine has not borne his burden of demonstrating that Counsel performed deficiently by choosing not to make a second authenticity objection to the video clips.

B.      Rule 403[5]

¶40   Vine next argues that Counsel should have objected to the video evidence under rule 403 of the Utah Rules of Evidence.

¶41   Under that rule, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. For purposes of this test, the "probative value of evidence is judged by the strength of the evidence and its ability to make the existence of a consequential fact either more or less probable and the proponent's need for the evidence." *Anderson-Wallace v. Rusk*, 2021 UT App 10, ¶ 19, 482 P.3d 822 (cleaned up). Rule 403 "imposes the heavy burden not only to show that the risk of unfair prejudice is greater than the probative value, but that it *substantially* outweighs the probative value." *State v. Smith*, 2019 UT App 141, ¶ 35, 449 P.3d 971 (emphasis added) (cleaned up).

---

5. In the section of his brief discussing rule 403, Vine also cites rules 401 and 402 of the Utah Rules of Evidence. To the extent Vine is attempting to argue that the video clips are not relevant, we disagree. Relevance is a "very low bar," *State v. Swearingen*, 2023 UT App 155, ¶ 11, 542 P.3d 123 (cleaned up), and on the facts of this case, the clips were clearly relevant to whether Lisa was unconscious during the events in question and in turn whether she had consented to anal sex.

¶42 Vine asserts that the video clips were unduly prejudicial because they contained poor audio quality; in particular, he asserts that Lisa and Vine were making sounds that could not be heard on the clips and that the inaudible portions were so substantial as to render the entire recording untrustworthy.

¶43 In this situation, a reasonable attorney could have decided that a rule 403 challenge would fail. The video evidence was highly probative of whether Lisa was unconscious at the time of the incident and, in turn, whether she consented to anal sex. And the asserted prejudice goes more to the weight of the evidence than to its admissibility. In this situation, Counsel could have reasonably believed that the clips' probative value was not substantially outweighed by the danger that it would have an unfairly prejudicial effect.

¶44 On this basis, we conclude that Vine has failed to demonstrate that Counsel performed deficiently by opting not to raise a rule 403 objection to the admissibility of the video clips.

C. The Best Evidence Rule

¶45 Vine next argues that, because the DVD containing the video clips was not the original recording, Counsel should have lodged an objection under rule 1002 of the Utah Rules of Evidence.

¶46 That rule states that "[a]n original writing, recording, or photograph is required in order to prove its content, except as otherwise provided in these rules." Utah R. Evid. 1002. However, rule 1003 states that duplicates are admissible "to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." *Id.* R. 1003.

¶47 Here, Counsel could have reasonably decided that a best-evidence objection would fail because the DVD was a permissible duplicate under rule 1003. Accordingly, we see no basis for

concluding that Counsel performed deficiently by opting not to raise such an objection.

D.    Personal Knowledge

¶48    Finally, Vine argues that Counsel should have objected to the admissibility of the video clips under rule 602 of the Utah Rules of Evidence, asserting that Lisa "did not have personal knowledge of the events" depicted in the clips. He further asserts that Lisa could not have laid foundation for the clips because she did not know "what actually occurred during the entire time period at issue."

¶49    "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." *Id.* R. 602. "In other words, a witness who does not have the opportunity and the capacity to perceive the events in question may not testify." *State v. Granere*, 2024 UT App 1, ¶ 49, 543 P.3d 177 (cleaned up), *cert. denied*, 558 P.3d 87 (Utah 2024).

¶50    Vine argues that "the State was required to establish that th[e] video clips were a true and accurate representation of the events that took place that evening." And he argues that the State could not "rely on Lisa to lay foundation that the video clips 'accurately reflected' the events of the evening as Lisa was not 'a competent witness with personal knowledge of the facts' of what actually occurred during that entire time period at issue." (Quoting *State v. Samora*, 2021 UT App 29, ¶ 24, 484 P.3d 1206 (cleaned up).)

¶51    But Counsel could have reasonably decided that Lisa had sufficient personal knowledge of the events in question to testify accordingly. Part of Lisa's testimony centered on her viewing the videos after the night in question, and to lay the foundation for this testimony, the State had asked Lisa whether the videos in

evidence "fairly and accurately represent what [she] viewed from [her] camera," to which she answered in the affirmative. Accordingly, Counsel could have reasonably determined that Lisa possessed personal knowledge sufficient to offer testimony about how the video clips were generated.

¶52 And to the extent Vine is asserting that Lisa lacked personal knowledge of the relevant events because she had been asleep or unconscious, it is unclear from Vine's briefing what exactly he thinks Counsel was supposed to object to. Even if Lisa was asleep or unconscious, she was still competent to testify as to what she knew; for example, she testified to setting up the camera, viewing the recordings after the incident, finding blood around her anus the morning after the incident, and confronting Vine about the blood, to which Vine affirmed that he had anal sex with her the evening before. None of this testimony was objectionable, and Counsel could have reasonably determined that the fact that Lisa had been asleep or unconscious during the video clips did not form a basis for excluding those clips.

¶53 For all these reasons, then, we conclude that Counsel did not perform deficiently in opting not to lodge pretrial evidentiary objections to the admissibility of the video clips.

## II. The Other-Acts Evidence

¶54 In his second ineffective assistance claim, Vine asserts that Counsel performed deficiently by failing to object to—or by opening the door to—the introduction of evidence that he refers to as prior-bad-acts evidence that he believes was inadmissible under rule 404(b) of the Utah Rules of Evidence. Vine focuses this argument on six statements in Lisa's testimony: (1) that she met Vine at a rehab facility where they were both in treatment for drug addiction; (2) that she suspected Vine was stealing from her; (3) that twice previously, she had awakened to Vine trying to have sex with her; (4) that on the day of this incident, both she and Vine had been released from jail; (5) that Vine "ended up getting

arrested" after the incident and "was in jail for a month"; and (6) that she and Vine were involved in a separate domestic violence case. With regard to the first five of these statements, Vine's claim fails because he has not demonstrated that Counsel performed deficiently. With regard to the sixth, we agree with Vine that Counsel performed deficiently by bringing the domestic violence allegations into the case, but as discussed below, we conclude that Vine has not demonstrated that he was prejudiced by this error.

¶55    Rule 404(b)(1) of the Utah Rules of Evidence prohibits the introduction of evidence "of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." This subsection of the rule "recognizes the dangers of exposing a jury to evidence of a defendant's acts of prior misconduct— specifically, the risk that the jury will infer that the defendant has a reprehensible character, that [the defendant] probably acted in conformity with it, and that [the defendant] should be punished for [t]his immoral character in any event." *State v. Thornton*, 2017 UT 9, ¶ 35, 391 P.3d 1016 (cleaned up). This forbidden line of thinking is sometimes referred to as a "propensity inference"— that is, if jurors are told that a person has acted in a certain way on previous occasions, they may conclude that it is in that person's character to act that way and may conclude that, due to this propensity, the person was much more likely to have acted in conformity with that propensity on the occasion in question. *See, e.g.*, *State v. Lucero*, 2014 UT 15, ¶ 14, 328 P.3d 841 (cleaned up), *abrogated on other grounds by Thornton*, 2017 UT 9.

¶56    But while evidence of a person's other bad acts is generally not admissible to prove propensity, rule 404(b) allows admission of such evidence for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Utah R. Evid. 404(b)(2). Thus, "when past misconduct evidence is offered for any other purpose—other than to suggest action in conformity with the bad

character suggested by [a defendant's] prior bad acts—such evidence is admissible so long as it satisfies rules 402 and 403." *Thornton*, 2017 UT 9, ¶ 36 (cleaned up).

¶57 Against this backdrop, we address (in groups) the six purported prior bad acts and assess whether Counsel performed deficiently with regard to evidence of these acts and, if so, whether Vine was prejudiced thereby.

A.     Context Testimony

¶58 "Rule 404(b) applies only to 'other' acts," meaning, "if the evidence of prior acts is inextricably intertwined with the crime that is charged, or if both the charged crime and the prior act are considered part of a single criminal episode, then rule 404(b) would not apply." *Lucero*, 2014 UT 15, ¶ 14 n.7 (cleaned up). "Rather, the act would be considered part of the case narrative and have important probative value that bears directly on the crime charged." *Id.* Some cases have referred to this other permissible purpose as the right of the parties "to show context," *State v. Labrum*, 2014 UT App 5, ¶ 22, 318 P.3d 1151, and "to present evidence with broad narrative value beyond the establishment of particular elements of a crime," *State v. Verde*, 2012 UT 60, ¶ 28, 296 P.3d 673 (cleaned up), *abrogated on other grounds by Thornton*, 2017 UT 9, *and State v. Green*, 2023 UT 10, 532 P.3d 930.

¶59 The first four acts in the list Vine identifies all appear to fall into this category of contextual intrinsic evidence. Stated another way, a reasonable attorney could have concluded that these four acts do not constitute other-bad-acts evidence at all and that rule 404(b) therefore does not apply to them. These four facts—that Lisa and Vine met in a substance abuse treatment program; that Lisa was suspicious of Vine stealing from her and therefore installed the camera; that Lisa had previously told Vine not to have sex with her while she was asleep; and that both Lisa and Vine were released from jail on the day the incident took place—

are simply contextual details that are important to the narrative of how the events in question unfolded. Moreover, at least some of them have evidentiary value in Vine's favor, and Counsel could have reasonably decided to use these facts to assist Vine in defending the case.

¶60 The first fact—that Lisa and Vine met at a substance abuse treatment center—simply provided context for how the two met and became romantically involved. And Counsel appears to have tried to use Lisa's history with methamphetamine for strategic purposes, such as to undermine her claims of nonconsent on the night in question and to undermine her credibility generally.

¶61 The second fact—that Lisa installed the camera in the bedroom at her mother's house because she suspected that Vine had been stealing from her—likewise provides important context for the events in question and provides a critical part of the foundational evidence for admission of the video clips.

¶62 The third fact—that Lisa had previously told Vine not to try to have sex with her while she was asleep—was highly relevant to whether she had consented to the sexual contact in question. While the text of Utah's consent statute arguably doesn't allow a person to pre-authorize sexual contact while the person is unconscious, *see* Utah Code § 76-5-406(2)(e) (stating that an enumerated sexual act "is without consent of the victim" if "the actor knows the victim is unconscious"), Lisa's statement to Vine is relevant to other theories of nonconsent, including situations in which a "victim expresses lack of consent through words or conduct," *see id.* § 76-5-406(2)(a). Accordingly, this evidence had "important probative value that [bore] directly on the crime charged." *Lucero*, 2014 UT 15, ¶ 14 n.7.

¶63 And the fourth fact—that Lisa and Vine were released from jail on the day of the incident—was also important for context, as it helped explain that Lisa and Vine hadn't had direct contact for several days before the incident. Moreover, it also had potential

strategic value for the defense because it conveyed that *Lisa too* had been released from jail on the day of the incident, thereby possibly reducing her credibility with the jury.

¶64    Accordingly, a reasonable attorney could have believed that these facts were admissible contextual details and on that basis forgone any objection. Vine has therefore failed to carry his burden of demonstrating that Counsel performed deficiently by opting not to lodge objections to these matters.

B.    Unsolicited Spontaneous Comments

¶65    Statements about two of the six acts in Vine's list were unsolicited and spontaneously uttered. That is, evidence of these acts came before the jury in the form of comments that were unresponsive to the questions put to witnesses. Under these circumstances, a reasonable attorney could decide to forgo making a motion to strike and asking for a curative instruction, because such actions have the unfortunate consequence of emphasizing testimony to which the jury might not have paid much attention. *See State v. King*, 2024 UT App 151, ¶¶ 32–33, 559 P.3d 96 ("[D]ecisions regarding whether to move to strike and seek a curative instruction are highly strategic ones that courts are loathe to second-guess."); *see also State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 ("[A] curative instruction may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure.").

¶66    The fourth fact—that Vine had been released from jail, along with Lisa, on the day of the incident—came out unsolicited. The prosecutor asked Lisa where she was when the day began, a question that did not seek information about Vine. Lisa responded that she "woke up [that day] in jail" and was released later that day. Without being asked or prompted, she added that "[Vine] was released with me as well."

¶67    And the fifth fact—that Vine "ended up getting arrested" after the incident and "was in jail for a month"—also came out unsolicited. During cross-examination, Counsel asked Lisa whether she had "decided to end [her] relationship" with Vine on the day after the incident, and she stated that they initially "decided to stay together" but that Vine "ended up getting arrested" and, because of that, the two of them "didn't really have time to discuss" their relationship for a while, but that after Vine "was released" a few weeks later, she told him she was "done."

¶68    Both of these facts were contained in answers that were unresponsive to the questions posed. In situations like this, an attorney's only active option is to move to strike the testimony and ask for a curative instruction. But here, Counsel could have reasonably decided not to do that, for reasons we have often explained. *See, e.g.*, *King*, 2024 UT App 151, ¶¶ 32–33. We therefore see no basis for concluding that Counsel performed deficiently by choosing not to take those actions.

C.    The Domestic Violence Allegations

¶69    The sixth act in Vine's list is somewhat more problematic. Vine complains that Counsel rendered ineffective assistance by asking questions that made the jury aware of the pending domestic violence case against Vine in which Lisa was the alleged victim. On this claim, we agree with Vine that Counsel's performance was deficient, but we reject Vine's claim nonetheless because Vine has not demonstrated that he sustained prejudice as a result of Counsel's conduct.

¶70    During his cross-examination of Lisa, Counsel was exploring the reasons why Lisa went back and re-reviewed the video clips, after initially looking at them and not finding anything "too crazy." Lisa had stated, during direct examination, that she had been prompted to do so by a friend. But there was some indication, in a police report, that Lisa had re-reviewed the video at the behest of "the case officer" in "a domestic violence

case." Counsel asked Lisa about that sentence in the police report and, in an attempt to impeach her, asked her whether it was really true that she had reviewed the video again at the behest of a friend. Lisa did not deny that the case officer had asked her to do that, but she maintained that her re-review of the video was "more so [at the] convincing of [her] friend."

¶71 Counsel certainly had good strategic reasons to explore with Lisa her motive for re-reviewing the video. Not only was Counsel attempting to show that Lisa had testified incorrectly during direct examination, but he was also attempting to show that Lisa might have had an ulterior motive to go back and look at the video clips again.

¶72 But Counsel could easily have done so without informing the jury that the other case had to do with domestic violence allegations by Lisa against Vine. For example, Counsel could have asked Lisa whether she had been asked to review the video clips by a case officer in an unrelated case. Indeed, Counsel conceded as much during trial, explaining that he "probably shouldn't have mentioned the word 'domestic violence.'" There was no strategic reason for Counsel to have asked the question the way he did, and a reasonable attorney would not have done so. On this basis, we agree with Vine that Counsel performed deficiently by introducing the unrelated domestic violence case to the jury.

¶73 Nevertheless, we agree with the State that Vine has not demonstrated that Counsel's decision was prejudicial. Prejudice occurs when "there is a reasonable probability that, but for [an attorney's] unprofessional errors, the result of the proceeding would have been different," and a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the

trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86; *see also State v. Soto*, 2022 UT App 107, ¶ 25, 518 P.3d 157 ("Under a counterfactual analysis, we consider whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." (cleaned up)).

¶74 We are simply not persuaded that, in a hypothetical counterfactual trial in which the jury did not learn of the pending domestic violence case involving Vine and Lisa, there would be a reasonable likelihood of a different outcome. In this case, the evidence of Vine's guilt was strong. The jury viewed video clips showing sexual contact between Lisa and Vine while Lisa was apparently unconscious. The jury heard Lisa's testimony that she found blood around her anus the day after the incident and—perhaps most notably—that when she confronted Vine about the blood, he admitted to having anal sex with her while she was asleep. The jury also heard Lisa's testimony that she had told Vine twice before not to have sex with her while she was unconscious. For these reasons, the likelihood of a different outcome in a counterfactual trial is not high enough to undermine our confidence in the jury's verdict in this case.

¶75 Accordingly, we reject Vine's ineffective assistance claim related to things he refers to as prior-bad-acts evidence.

### III. The Jury Instructions

¶76 Finally, Vine asserts that Counsel rendered ineffective assistance by not ensuring that the jury was properly instructed as to the consent element of forcible sodomy. To convict a defendant of forcible sodomy, the State must prove, among other requirements, that the victim did not consent to the physical contact. *See* Utah Code § 76-5-403(2)(a). In this case, the court gave two instructions that, together, told the jury what the law requires in this regard: an elements instruction that set forth the elements of the crime of forcible sodomy, and a consent instruction that set

forth the law regarding consent. Vine asserts that these instructions contained two infirmities. First, he asserts that the consent instruction included theories of nonconsent for which he was not provided notice, and that it erroneously stated that the jury was not limited to the theories provided. Second, he contends that the two instructions, taken together, set forth an incorrect (and lower) mens rea requirement for two of the theories of nonconsent. For the reasons discussed, we conclude that Vine has not demonstrated that Counsel performed deficiently by opting not to object to these two instructions.

A.    Theories of Nonconsent

¶77    Vine first argues that Counsel should have objected to the consent instruction because it included theories of nonconsent for which he was not provided notice and because it stated that the jury was not limited by the theories of nonconsent listed.

¶78    The consent instruction included five theories of nonconsent: "lack of consent through words or conduct"; lack of consent "through the application of physical force or violence"; lack of consent "through concealment or by the element of surprise"; lack of consent because Vine "knew that [Lisa] was unconscious, was unaware that the act was occurring, or was physically unable to resist"; or lack of consent because Vine "knew that as a result of mental illness or defect, or for any other reason, [Lisa] was incapable at the time of the act of either understanding the nature of the act or of resisting it."

¶79    Vine contends that he was not provided notice for some of these theories of nonconsent and that "no evidence" was presented in support of those theories. Indeed, he argues that the "only form of non-consent for which Vine was provided notice was that he allegedly engaged in sex with Lisa while she was unconscious" and, thus, the additional theories of nonconsent were prejudicial.

¶80 But Counsel opted not to raise a notice objection to additional theories of nonconsent, and he apparently did so for strategic reasons. Indeed, after the State proposed listing only one theory of nonconsent, Counsel interjected and proposed a more robust list of nonconsent theories than the State because, in Counsel's view, "limiting [the instruction] to just being unconscious, unaware of the act, or physically unable to resist limits it too much in what the jury would be able to consider." For example, regarding the "expressed lack of consent through words or conduct" definition, Counsel explained that "[t]here's 4,209 seconds of time that elapses between the start of the video clips and the end of the video clips," yet only "72 seconds of that time period" were in evidence. As a result, Counsel argued that because there was a gap in "what went on during the other 4,100 and some odd seconds," the State "should have to prove beyond a reasonable doubt that [Lisa] expressed lack of consent through words or conduct or not." Counsel further explained that several other nonconsent theories listed in the statute should be included because "the same type of argument would apply."

¶81 In our view, this strategy was not unreasonable. Indeed, had the instruction been limited to the single unconsciousness theory for which the State had provided notice, Counsel's task may have been more difficult given the video evidence. Not only did Lisa appear unconscious in the video, but Lisa had testified to being unconscious (or not remembering the events), and Detective testified to Lisa appearing unconscious in the video. Thus, Counsel could have reasonably decided that the jury instruction should include *more* theories of nonconsent so that he could attempt to dilute, or mask, the most potent one. While not every reasonable attorney would have chosen this strategy, we cannot say that Counsel's choice was unreasonable.

¶82 And to the extent Vine argues that these theories of nonconsent were unsupported by evidence, we note here that the court expressly addressed that issue with Counsel. Counsel had

asked for *eight* theories of nonconsent to be incorporated into the instruction. Yet the court explained that it was unwilling to do that because "including all of the factors is just absurd under some of these circumstances." That is why the court ruled that it was "going to come down somewhere in the middle," by adding some additional theories Counsel had proposed and keeping "in many of the factors the State has suggested."

¶83    Vine also argues that Counsel should have objected to the last two sentences contained in the consent instruction. Those sentences provided as follows: "In deciding lack of consent, you are not limited to the circumstances listed above. You may also apply the common, ordinary meaning of consent to all of the facts and circumstances of this case." Vine argues that these sentences impermissibly allowed the jury to "convict upon its own theory of non-consent."

¶84    Our supreme court, however, has explained that Utah's consent statute "does not define nonconsent" but instead "merely limits the various theories of consent that might otherwise be available." *State v. Barela*, 2015 UT 22, ¶ 38, 349 P.3d 676 (cleaned up). Indeed, "consent—or nonconsent, to put it in terms of an element of a crime—is a fact-intensive, context-dependent question, decided on a case-by-case basis," and "our law has long left [that question] in the hands of the jury." *Id.* ¶ 39. The items listed in the statute are simply "exceptions to the general rule," and represent a legislative determination that, as a matter of law, "abuse is without consent of the victim under the circumstances enumerated in the statute." *Id.* ¶¶ 40–41 (cleaned up).

¶85    Indeed, we have stated that the consent statute "does not preclude the fact-finder from determining that circumstances outside those defined in the statute may still amount to lack of consent in any particular case." *State v. Thompson*, 2014 UT App 14, ¶ 90, 318 P.3d 1221 (cleaned up). And we have held that a consent instruction that contained two catch-all sentences at the

end remarkably similar to the two sentences at issue here was entirely proper because it "correctly indicate[d] that the jury is not prevented from determining that circumstances outside those listed in the statute amount to lack of consent and that the jury can consider whether the totality of the evidence supports a finding of lack of consent under its common, ordinary meaning." *Id.* (cleaned up). It is also worth noting that the consent instruction that Vine challenges was taken directly from MUJI. *See* Model Utah Jury Instructions 2d CR1615 (2020), https://legacy.utcourts.gov/muji/?cat=2 [https://perma.cc/3VQQ-UCBC]; *see also infra* note 6.

¶86 In this situation, Counsel did not perform deficiently by opting not to raise these two objections to the consent instruction. Counsel had strategic reasons for wanting more theories of nonconsent listed in the instruction, and Counsel could have reasonably believed that any objection to the last two sentences would readily be overruled given the state of the caselaw.

B. Mens Rea

¶87 Finally, Vine argues that the forcible-sodomy-elements instruction, when read together with the consent instruction, provided the jury with an incorrectly low mens rea requirement for two of the listed theories of nonconsent.

¶88 The jury was instructed that, in order to find Vine guilty of forcible sodomy, it had to find that Vine "acted: a. with knowledge that [Lisa] did not consent; or b. recklessly as to whether [Lisa] consented." But two of the theories of nonconsent listed in the consent instruction appear to require that Vine had *knowledge*, and do not appear to allow conviction if Vine was merely *reckless*. Specifically, the "unconsciousness" theory of nonconsent requires that Vine "knew that [Lisa] was unconscious, was unaware that the act was occurring, or was physically unable to resist." And the "mental illness" theory of nonconsent requires that Vine "knew that as a result of mental illness or defect, . . .

[Lisa] was incapable at the time of the act of either understanding the nature of the act or resisting it." From this, Vine posits that the instructions as to those two theories of nonconsent are confusing and that a jury could perhaps believe that it could convict Vine under those theories if Vine were merely *reckless* as to Lisa's unconsciousness or mental illness. And Vine asserts that Counsel should have pointed this out and lodged an objection.

¶89 But in this case, Counsel could have reasonably determined that such an objection would have been futile because the forcible sodomy and nonconsent instructions both accurately stated the law.[6] Utah's consent statute lists twelve situations—or theories—in which a sexual act is, as a matter of law, deemed to have been taken without consent, and notably, some (but not all) of the theories incorporate a specific mens rea requirement. *Compare* Utah Code § 76-5-406(2)(e) ("[T]he actor *knows* the victim is unconscious . . . ." (emphasis added)), *and id.* § 76-5-406(2)(h) ("[T]he actor *intentionally* impaired the power of the victim to appraise or control his or her conduct by administering any substance without the victim's knowledge." (emphasis added)),

---

6. Moreover, both the elements instruction and the nonconsent instruction came directly from MUJI. *See* Model Utah Jury Instructions 2d CR1609 (2015), https://legacy.utcourts.gov/muji/?cat=2 [https://perma.cc/3VQQ-UCBC]; MUJI CR1615. And these model instructions match the statutes very closely. Of course, "the fact that [an] instruction came from MUJI is not necessarily dispositive," because the model instructions "are merely advisory and do not necessarily represent correct statements of Utah law." *State v. Wall*, 2025 UT App 30, ¶ 53, 566 P.3d 833 (cleaned up). But—at least in cases where there is no clear law indicating that the MUJI instruction is inaccurate—the fact that an instruction comes directly from MUJI is a fact that can be considered in determining whether an attorney rendered deficient performance in opting not to object to an instruction.

*with id.* § 76-5-406(2)(a) ("[T]he victim expresses lack of consent through words or conduct."). The consent instruction in this case simply incorporated the statutory language. In other words, each theory of nonconsent in the instruction accurately incorporated the relevant mens rea—or lack thereof—from the statute.

¶90 Furthermore, the forcible sodomy statute's consent element does not include a specific mens rea requirement. *See id.* § 76-5-403(2)(a) ("An actor commits forcible sodomy when the actor commits sodomy upon another individual without the other individual's consent."). And when a mens rea requirement does not appear in the relevant part of the crime, recklessness generally suffices as a culpable mental state. *See id.* § 76-2-102 ("Every offense not involving strict liability shall require a culpable mental state, and when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility."). Reading these two instructions together, Counsel could have reasonably concluded that *recklessness* in the forcible sodomy instruction applied to the nonconsent theories that did not have a specific mens rea requirement, whereas *knowledge* would apply to the theories that expressly incorporated knowledge into their definition.

¶91 It is also relevant to our analysis that Vine, in his briefing, makes no attempt to explain how these two instructions should have been edited to remedy the situation. It is unclear whether Vine is asserting that Counsel should have suggested edits to the elements instruction, to the consent instruction, or both, or whether Counsel should have suggested a third instruction that clarified the issue separately.

¶92 Under these circumstances, where the instructions are an accurate reflection of statutory requirements, come directly from MUJI, and have a meaning that appears clear enough, and where Vine does not suggest any specific fix, we conclude that Vine has

not borne his burden of demonstrating that Counsel performed deficiently by not objecting to these instructions. On this basis, we reject Vine's final claim of ineffective assistance of counsel.

## CONCLUSION

¶93    Vine has not demonstrated that Counsel rendered ineffective assistance in any of the particulars he asserts. We therefore reject his arguments and affirm his conviction.

―――――――――